**C.S. SASTRY, Appellant,**

v.

**John P. COALE, Appellee.**

**No. 89–605.**

District of Columbia Court of Appeals.

Argued Oct. 24, 1990.
Decided Jan. 15, 1991.

Sarabjit Singh, for appellant.

Curt S. Hansen, for appellee.

Before STEADMAN and FARRELL, Associate Judges, and KERN, Senior Judge.

FARRELL, Associate Judge.

This litigation arose from an unsuccessful attempt to develop legal business in Bhopal, India among the victims of the disaster at the Union Carbide plant in 1984. C.S. Sastry, appellant, rendered services in support of the efforts of attorney John P. Coale, appellee, to locate potential clients in Bhopal. Sastry claims that Coale failed to pay full compensation for 800 hours of work. At the end of Sastry's case-in-chief, the trial judge granted Coale's motion for a directed verdict, concluding that because Sastry had presented inconsistent evidence about the terms of the compensation agreement and insufficient evidence of the value of his services, a valid jury verdict in his favor was impossible.

After reviewing the evidence presented in the light most favorable to appellant, we conclude that he established a prima facie case of breach of contract: he demonstrated the existence of an express or implied-in-fact contract for services which was fully performed, and he established a "reasonable basis on which to estimate damages." *Romer v. District of Columbia,* 449 A.2d 1097, 1100 (D.C.1982) (citations omitted). Therefore, we vacate the judgment and remand for further proceedings.

I.

Sastry, a self-employed men's clothing salesman, testified that he was familiar with the country of India and the city of Bhopal. Before becoming a salesman, he had worked in the international division of a corporation where he was a product marketing manager. In that job he traveled extensively in India and established both business and political contacts in Bhopal. He is fluent in Hindi, the dominant language spoken in Bhopal. Some of his family members live in India and he has property located there. He also knows employees of the embassy of India.

In December 1984, Coale heard about the disaster at the Union Carbide plant in Bhopal. Having been a customer of Sastry's for a number of years, he arranged a meeting with him to discuss forming a "team" to develop legal business in Bhopal in the wake of the disaster. Sastry agreed to meet the next day in Coale's office. He, Coale, and two other individuals attended

the meeting, at which Coale expressed enthusiasm about the venture and Sastry shared the "excitement." According to Sastry, Coale proposed paying him one third of his earnings from legal business in Bhopal for his services.[1] Coale and the other two participants decided to leave for Bhopal immediately, and asked Sastry to join them. Sastry agreed to do so for a fee of $3,000. At the time of the initial meeting, he did not know how much he would eventually be paid, but he agreed "to provide the help and service." Coale paid Sastry $3,000 and the group flew to India in December.

Sastry spent six days in Bhopal working for Coale.[2] His duties included making travel arrangements to and from India; contacting Bhopal city officials on behalf of Coale to arrange meetings with disaster victims; reviewing the Hindi translation of Coale's form retainer agreement for victims and coordinating the printing of the form agreements; and collecting, tabulating, and classifying retainer agreements executed by victims.

At the end of January 1985,[3] Sastry decided to go to India on personal business for the month of February. When he told Coale of his plan, Coale replied, "[A]s long as you are going to be in India I want you ... to reestablish my position [in Bhopal] with the mayor and with the other people that we had established contact with." Regarding compensation, Sastry "kept reminding" Coale that the Bhopal work was "taking time away from my business" and "jeopardiz[ing] my income." Coale assured Sastry that the work would be "very well compensated." Sastry went to India in February and spent five days in Bhopal working for Coale.[4] His duties included collecting executed retainer agreements and supervising the "field work" in Bhopal.

Sastry's last trip to India on Coale's behalf took place in July 1985.[5] In early July Coale asked him to return to Bhopal as his "personal emissary" to "refine the agreement" and "collect the documents" pertinent to certain cases. In July Coale paid Sastry $4,000 for services but, according to Sastry, most of that cash "flowed through" him to cover expenses. Once in Bhopal, Sastry hand-carried a letter from Coale to a Bhopal official; insured the payment of the Bhopal staff workers by using his own property as collateral for a loan; obtained signatures for a movie release agreement; and obtained death certificates.[6] Finally, from August through November 1985, Sastry continued working at his home and in Coale's office on tasks related to the Bhopal litigation.[7] His employment relationship with Coale ended in January 1986.

In his testimony, Sastry acknowledged that he received $5,000 in payments for services from Coale,[8] but claimed that this sum failed to compensate him for the total of 800 hours he spent on the Bhopal project from December 1984 through November

---

**1.** It is clear from the evidence, and Sastry does not dispute, that ultimately Coale received nothing from his work in the Bhopal litigation.

**2.** Sastry testified that he worked 18–20 hours per day for Coale in Bhopal from December 9 through December 14, 1984. He estimated that he spent a total of 299 to 302 hours working for Coale on this trip including travel time.

**3.** Sastry was unclear whether he spent one day or 78 hours on the Bhopal project during January 1985.

**4.** During February 1985, Sastry testified he spent a total of 144 hours working for Coale including five days in Bhopal, three days traveling, and making numerous telephone calls.

**5.** During the spring of 1985 Sastry worked on the Bhopal litigation project, meeting with Coale and translating executed retainer agreements.

He testified that his hours of work were as follows: March 1985, 20 hours; April 1985, 8 to 10 hours; and May 1985, 7 hours.

Sastry also worked for another lawyer in Bhopal. In August 1985 he traveled to Bhopal to collect retainer agreements on behalf of the other lawyer, who paid him $4,000 for his services for one week in Bhopal.

**6.** Sastry estimated that he spent 98 to 100 hours working for Coale in July 1985.

**7.** Sastry's estimates of the time he spent translating documents and organizing claims from August through November varied considerably, but the low-end figure amounted to approximately 80 hours.

**8.** Sastry made no claim for expenses, conceding that all of his expenses had been fully reimbursed by Coale.

1985. On cross-examination, Sastry was pressed closely as to the compensation term of his agreement with Coale—specifically whether any payment for services other than the amounts he had received was contingent on a successful outcome. In the complaint he had asserted as fact that, at the original December meeting, Coale "offered to 'split' his earnings or at least give 30 percent" and that "[p]laintiff accepted and then agreed to go with [Coale and his associates]." On direct examination, Sastry at first denied that it "was ... the idea at all" that he was to be paid strictly out of Coale's earnings in the litigation; he stated that their discussions about compensation essentially consisted of Sastry asking for (and receiving) $3,000 to cover the expected five days in India,[9] and that thereafter he kept reminding Coale that the absence from his clothing business was jeopardizing his income. On cross-examination, however, Sastry conceded that Coale had "mentioned" at the initial meeting an offer to give Sastry "up to 30 percent" of any recovery. His testimony continued as follows:

Q. And then the last sentence in paragraph seven [of the complaint] says: "Plaintiff accepted and then agreed to go with them." Is that correct?

A. All right.

Q. You accepted?

A. Uh-huh.

Q. You accepted an offer and that was the deal; correct?

A. Yeah.

Pressed to admit, therefore, that he was "not entitled to a cent" because Coale had earned nothing from the Bhopal litigation, Sastry balked and insisted that "[t]hat was not my agreement with Mr. Coale.... When he asked me to accompany him, why did he agree to give me $3,000 for four or five days' work?" On re-direct, he confirmed that "one of the ways" Coale had suggested for compensation was to "split his earnings or at least give 30 percent," but that "another form" was reflected in

Sastry's insistence that he could only accompany Coale the first time if he received $3,000. On the basis of this demand and Coale's acceptance of it, Sastry understood that in the future he would be compensated similarly for his services—somewhere between his gross income from the clothing business of $100 to $125 per hour and his net income of $22 to $25 per hour.

The trial judge, in granting the motion for a directed verdict, acknowledged that Sastry's evidence supported the existence of an express oral contract for services. He concluded, however, that Sastry's testimony, summarized above, was fatally inconsistent in regard to the compensation term, pointing both to a pure contingent agreement and, at the same time, an agreement for "substantial" compensation for services rendered, though without agreement on a precise formula. This inconsistency, the judge reasoned, made it impossible for "a reasonable juror [to] determine which of these two scenarios was the accurate one."

Furthermore, whichever scenario the jury selected, the judge concluded they would reach the same verdict because there was insufficient evidence of the value of Sastry's services. If the jury found an explicit oral contingency arrangement, they would find no liability since the evidence showed Coale had never earned money on the Bhopal litigation project. If they found the parties had left the terms of compensation open, then Sastry had failed to produce "any real evidence as to how any of these types of services"—including liaison and "paralegal" work—"were or should be valued," and thus the amount of damages would be speculation. Since the jury's verdict for Coale would have to be the same under either interpretation, the court entered judgment for Coale.

## II.

■ "[A] verdict may be directed only when the evidence is so clear that reasonable men could reach but one conclusion."

---

**9.** He acknowledged, however, that Coale "threw a number at [him] over the telephone the very first day," *viz.,* "one third of his earnings."

*Bauman v. Sragow*, 308 A.2d 243, 244 (D.C.1973). In acting upon such a motion, "the judge is not the trier of fact; thus, he must deny the motion if, viewing the evidence in the light most favorable to the plaintiff, the plaintiff has established a prima facie case." *Marshall v. District of Columbia*, 391 A.2d 1374, 1379 (D.C.1978). Of particular note in a case such as this where plaintiff's credibility was severely tested by cross-examination, the court in ruling on the motion may not substitute its judgment as to the reliability or weight of testimony for the jury's. *See, e.g., Baltimore & Ohio R.R. v. Corbin*, 73 App.D.C. 124, 126, 118 F.2d 9, 11 (1940) (jury issue "whether attempted impeachment of plaintiff's witness was successful"); *Myers v. Gaither*, 232 A.2d 577 (D.C.1967), *aff'd in pertinent part*, 131 U.S.App.D.C. 216, 404 F.2d 216 (1968) (submission of case to jury required when inconsistent and contradictory testimony raises issue of witness credibility).

■ We conclude that Sastry's testimony was not so internally inconsistent that a rational jury could not credit his assertion that the parties agreed he would be paid for his services whether or not Coale earned fees from the Bhopal litigation. Sastry acknowledged that Coale spoke of a contingent fee agreement at or before their first meeting, but when Sastry requested $3,000 for the initial trip and Coale paid him that amount, the jury could fairly infer an agreement that future work would be compensated in similar payment-for-services-rendered fashion. Indeed, there is no dispute that Coale made an additional $4,000 payment to Sastry in July 1985. Given Sastry's additional testimony that it cost him substantial sums of money to be away from his business, and that he kept reminding Coale of this fact, the jury could reasonably find from all the circumstances that the parties intended some degree of compensation not contingent on the outcome of the litigation.[10] Whether Sastry had in fact received all he was entitled to was for the jury to decide.[11]

### III.

■ The trial judge further reasoned, however, that even if Sastry had proved an agreement for non-contingent compensation (though with the terms of payment left open), he presented no evidence from which the jury could determine the fair-market value of the services performed. Noting that much of what Sastry claimed to have done was in the nature of paralegal work, the judge pointed out that neither by expert testimony nor by questioning of Coale (whom Sastry had called as a witness in his case) had Sastry established how such services are typically compensated. The same was true of the translation work he claimed to have done. Sastry's testimony about how his "time has been valued in his own [clothing] business," the trial judge concluded, furnished no measure of the value of his services in the wholly unrelated field of assisting in litigation.

To recover on a breach of contract claim for services rendered, a plaintiff must prove the amount of damages he is entitled to receive. *Cahn v. Antioch Univ.*, 482 A.2d 120, 130 (D.C.1984). Although damages " 'may not be based on mere speculation or guesswork,' " *Romer*, 449 A.2d at 1100, it is enough that there is "some reasonable basis on which to estimate [them]." *Cahn*, 482 A.2d at 130 (quoting *Romer*, 449

---

10. Indeed, Coale's position apparent from cross-examination of Sastry was that he had paid him in the neighborhood of $28,000 for his services over the course of the relationship. Sastry, on the other hand, maintained that all of this money except $5,000 had "flowed through" him to cover expenses.

11. The trial judge was understandably troubled by the ethical implications of an offer by Coale to split any earnings with Sastry. *See* Rule 5.4, Rules of Professional Conduct (adopted March 1, 1990); *see also* former DR 3–102(A). In a subsequent letter to Sastry dated July 25, 1985, Coale acknowledged that, "under the District of Columbia Code of Professional Responsibility, and as a matter of fact, every code of professional responsibility, it is a violation for me to give you a percentage of my fee." He added, however—and in so doing gave additional support to Sastry's prima facie case—that "it is not a violation for me to give you fair compensation for your contribution, which I fully intend to do."

A.2d at 1100). As we stated in *Jonathan Woodner Co. v. Laufer*, 531 A.2d 280, 287 n. 12 (D.C.1987) (citation omitted), "Unless the reasonable value of a claimant's services [is] a matter of common knowledge, there must be some probative evidence on the issue of value," but we have not required the value to be shown precisely. *Cahn, supra.*

■ When a contract for services is fully performed, as it was in this case,[12] recovery is measured in two ways: either "by the definite amount agreed upon and no more, if the agreement is definite as to amount, or ... the fair value of [the employee's] services if there is no agreement for a definite amount." RESTATEMENT (SECOND) OF AGENCY § 443 (1957). *See Edmund J. Flynn Co. v. LaVay*, 431 A.2d 543, 548 (D.C.1981). When no definite amount has been stated, and there is no customary rate for the services, "it is inferred that, in a transaction in which some compensation is due, the parties have agreed that the agent is to receive the reasonable value of his services." RESTATEMENT (SECOND) OF AGENCY, *supra*, § 443 comment d; *IBF Corp. v. Alpern*, 487 A.2d 593, 597 (D.C.1985). There are several available measures of reasonable value, the "most favored [of which] is market value.... [The employer] has received service that he requested, for which the plaintiff could have obtained a price in the market." *IBF Corp.*, 487 A.2d at 597–98 (citations and internal quotation marks omitted).

In this case, Sastry testified that another attorney had paid him $4,000 as compensation for a retainer-gathering trip to Bhopal in August 1985. This August 1985 trip was similar to the trips Sastry took on behalf of Coale in December 1984, February 1985 and July 1985. On the occasion of the third trip Coale too gave Sastry $4,000, comparable to the $3,000 he had given him for the first trip. Coale's actions were those of a person the jury could reasonably infer was familiar with the market value of "paralegal" services such as Sastry performed. Thus, the testimony about what he and the other attorney each paid Sastry for similar services constituted "some probative evidence," *Jonathan Woodner Co., supra*, of the value of Sastry's services in the market.

■ Sastry also testified that his time spent conducting his clothing business was worth between $22 per hour (net income) and $125 per hour (gross income). He relies on the principle that "[t]he claimant is generally deemed competent to testify as to the value of his or her own services." *Jonathan Woodner Co.*, 531 A.2d at 287 n. 12. We think, however, that the trial judge correctly dismissed this testimony as irrelevant to establishing the market value of the entirely unrelated services Sastry performed for Coale. Nonetheless, as we have seen, both the sums Coale twice paid Sastry for trips to India and a similar payment by another attorney for like services provided a measure by which the jury could assign value to the work Sastry performed. He testified that altogether he had worked 800 hours for Coale (including 300 during the first trip), and had received only about $5,000 in total compensation. Although he was challenged strongly on both claims, his testimony and Coale's actions furnished a non-speculative basis on which the jury could determine what additional compensation, if any, he was owed for his services.[13]

---

12. The trial judge agreed that Sastry had performed a variety of services for Coale, and that the subsequent letter from Coale to Sastry, see note 11, *supra*, "expressed clear acknowledgement that the services have indeed been well performed, and were of value." The jury could properly find that the relationship ended by mutual agreement in January 1986.

13. Contrary to appellee's suggestion, the fact that Sastry's services ultimately did not benefit Coale (who reaped nothing from the Bhopal litigation) is beside the point. "Ordinarily, if the [employee] acts properly, the fact that the [employer] has received no benefit is immaterial, as where a servant digs a well which proves to be dry." RESTATEMENT (SECOND) OF AGENCY, *supra*, § 443 comment d. Even under principles of restitution not applicable to the express or implied-in-fact contract in question here, the fact that the person consenting to receive services "asked for them shows that they are of value to him even though resulting in no pecuniary advantage, and normally he would be required to pay the market price of such services." RESTATEMENT OF RESTITUTION § 155 comment d & illustration 2 (1936).

For these reasons, the judgment of the Superior Court is

*Reversed.*