**Rene GARCIA, Appellant,**

v.

**Lorenzo LLERENA, Appellee.**

**No. 90–1492.**

District of Columbia Court of Appeals.

Argued Oct. 1, 1991.

Decided Nov. 27, 1991.

Ernesto Santiago Clarke, Washington, D.C., for appellant.

Philip M. Musolino, Washington, D.C., for appellee.

Before FERREN, TERRY and SCHWELB, Associate Judges.

FERREN, Associate Judge:

Plaintiff-appellant sold his restaurant business to a purchaser for cash and a promissory note. The purchaser, continuing to operate a restaurant, signed a new lease for the premises with the appellee-landlord. Appellant entered into a separate option contract with the landlord requiring the landlord to notify appellant if the purchaser defaulted on the lease. The contract further provided that appellant could cure any default and re-enter the premises to operate the restaurant. The purchaser-tenant defaulted, but the appellee-landlord failed to notify appellant. The tenant was evicted. When appellant found out about the default, he sued the appellee-landlord for breach of the option contract. The landlord conceded that he had evicted the tenant without giving appellant the agreed-upon notice and opportunity to re-enter. The trial court, however, directed a verdict for the appellee-landlord because appellant failed to prove damages.

Appellant raises four issues on appeal: (1) the trial court abused its discretion in excluding evidence of the appellee-landlord's offers to purchase the tenant's rights under the lease, since the amounts of these offers were relevant to damages; (2) the court erred in granting a directed verdict for the appellee-landlord on the ground of insufficient proof of damages; (3) the court erred in refusing to disqualify appellee's counsel, Philip M. Musolino, Esq., based on counsel's participation in the events giving rise to this litigation; and (4) the court abused its discretion in forbidding appellant to call Musolino and his associate, Lisa Dessel, Esq., as fact witnesses. We affirm.

## I. The Facts and Proceedings

Appellant Rene Garcia is a former stockholder and officer of G.O., Inc., an entity which operated a restaurant at 702 and 702½ 5th Street, N.W., on premises the corporation leased from Lorenzo Llerena, the appellee-landlord. Garcia had personally guaranteed G.O., Inc.'s first lease from Llerena. In late 1981, Garcia and his partners sold their stock in G.O., Inc., with its restaurant business, to Narinder Sharma for $140,000 in cash and promissory notes. At about the same time, on November 17, 1981, Llerena, the landlord, entered into a new lease with G.O., Inc., guaranteed this time by Sharma and his wife.

During the period of negotiations for sale of the restaurant, Garcia and Llerena entered into a separate agreement, the "Option to Assume Lease Agreement," which is the subject of this litigation. The express purpose of this option contract was to assure Garcia, as the optionee, the right to take over the lease from Sharma and to continue the restaurant business on the leased premises if the Sharmas defaulted on their lease obligation. The option contract obligated Llerena, as the landlord, to give Garcia written notice of any default by G.O., Inc. or the Sharmas. If the tenant

failed to cure the default within the time period set forth in the lease agreement, then Garcia, at his option, had the right to cure the default and to assume the new lease.

In June 1985, Llerena hired attorney Pablo Santiago, Jr., to investigate possible tenant violations of the lease. Santiago wrote to Sharma asking him to verify that the property was insured in the manner, and at the value, required by the lease. This letter, which was never introduced in evidence, was the basis for Llerena's position at trial that Sharma had been on notice of default if, in fact, his insurance coverage was inadequate. Sharma denied receiving any notice of default in June 1985. Nor was Garcia notified of any default in 1985.

In July 1985 Group Health Association (GHA) offered Llerena $379,400 to buy the building in which the restaurant was located. GHA conditioned its offer, however, on purchasing the property free of tenants.

Twice in December 1985, Llerena offered, through Santiago, to purchase the tenant's rights under the lease for $25,000. Santiago sent the first letter on December 24, 1985. Although it referred to the tenant's "violations of a variety of the provisions in the lease, and violations of the terms of [the] liquor license," Llerena did not notify Garcia of the alleged violations as he had agreed to do under the option contract. Santiago sent Llerena's second offer for $25,000 to James F. Flint, the Sharmas' attorney, on December 31, 1985. This letter gave the tenant only until the close of business on January 3, 1986 to accept the offer, because the sale of the property to GHA was scheduled to close on January 7. The tenant allowed the time for acceptance to expire.

On January 24, 1986, landlord Llerena, through attorney Santiago, sent a notice of default to the tenant, alleging that "dancing and loud music" emanating from the restaurant, without the written consent of the landlord, was a violation of Paragraph 5 of the lease. Despite his obligation to notify Garcia of any such default, Llerena failed again to inform Garcia.

In March 1986, the landlord made another offer to purchase the tenant's rights under the lease, this time for $50,000. Although characterized as an offer to settle the landlord-tenant dispute, the offer included the following terms:

> My clients will pay your clients $50,000.00 representing a reimbursement for loss of business, loss of good will, and the difference in rent between what your clients are presently paying and that which they will be paying at their new location.
>
> * * *
>
> My clients, through this office, will assist your clients in securing a new location near to the location of your clients' restaurant.

The Sharmas turned this offer down.

In June, and again in September, 1986, Llerena, now communicating through attorney Musolino, sent the Sharmas two more notices of default, neither of which was conveyed to Garcia. Finally, in October 1986, Llerena filed an action in the Landlord and Tenant Branch to evict G.O., Inc. and the Sharmas' restaurant from the property.[1] Eviction was accomplished in October 1987. Musolino's associate, Lisa Dessel, Esq., was present at the eviction and, on behalf of Llerena, entered into an agreement giving Sharma ten days to remove his personal belongings from the premises. When Sharma attempted to contact Llerena's principal attorney, Musolino, at his law office to arrange for such removal, Musolino refused to speak with him. Sharma never regained possession of his personal belongings, including the restaurant's financial records.

It was only after the eviction, when Sharma failed to make the November 1987 payment to Garcia on the promissory note, that Garcia discovered the restaurant had been closed and the tenant evicted. Garcia's attorney, Edward Smith, Jr., Esq., wrote to Llerena on November 5, 1987 and

---

1. *Llerena v. G.O., Inc.,* No. L & T 71874–86 (June 23, 1987). After trial, Judge Riley entered a judgment for Llerena, the landlord. We affirmed the judgment in an unpublished Memorandum Opinion and Judgment. *G.O., Inc. v. Llerena,* No. 87–835 (July 19, 1989).

to Musolino on November 13, 1987 indicating that Garcia had recently learned of the Sharmas' alleged default under the lease and of the eviction proceedings. Both letters asserted Garcia's rights under the option contract. Smith's letter to Llerena (a copy of which was enclosed with his letter to Musolino) suggested that Llerena or his attorney contact Smith to discuss the situation. Neither Llerena nor Musolino answered this correspondence.

As the foregoing chronology indicates, Llerena never gave Garcia notice of any default under Llerena's lease agreement with G.O., Inc. and the Sharmas. Garcia therefore had no opportunity to exercise his rights under the option contract to cure any default and to assume the lease before Llerena evicted the Sharmas and closed the restaurant. Garcia accordingly filed suit against Llerena on March 11, 1988[2] for declaratory judgment and breach of contract. The case came to trial on November 7, 1990.

As a preliminary matter, Garcia moved to disqualify attorney Musolino and his law firm, citing DR 5–101(B) (Refusing Employment When the Interests of the Lawyer May Impair His Independent Professional Judgment) and DR 5–102(A) (Withdrawal as Counsel When the Lawyer Becomes a Witness).[3] The motion was denied. The court also refused to allow Garcia to call Musolino as a fact witness even though Garcia had listed him as a potential witness in Garcia's pretrial statement. In addition, the court refused to allow Garcia to call attorney Dessel to testify. Finally, over Garcia's objection, the court excluded both documentary evidence and testimony about Llerena's offers to purchase the tenant's rights under the lease. The court reasoned

that these offers had been made in an effort to settle a then-existing dispute between the landlord and tenant and that they accordingly were inadmissible under applicable rules of evidence. At the close of plaintiff Garcia's case after four days of testimony, the trial court granted defendant Llerena's motion for a directed verdict.

## II. THE LANDLORD'S OFFERS TO "BUY OUT" THE TENANT

At trial, Garcia's counsel tried to introduce evidence that, after receiving GHA's offer to purchase his building, Llerena offered Sharma $25,000, then $50,000, and finally $100,000 to give up the leasehold. Garcia proffered evidence of these offers as proof of his damages, *i.e.*, as proof of Llerena's own valuation of the leasehold interest Garcia would have received had Llerena permitted him to exercise his rights under the option contract.[4] The trial court refused to admit evidence of the offers,[5] however, on the ground that under applicable rules of evidence they were excludable as offers of settlement and compromise of existing conflict between a tenant and a landlord. *See Pyne v. Jamaica Nutrition Holdings Ltd.*, 497 A.2d 118, 126–27 (D.C.1985) (offer to compromise or agreement to settle claim inadmissible on issue of liability); *see also Beckman v. Farmer*, 579 A.2d 618, 647–49 (D.C.1990) (letter offering settlement but disclaiming liability inadmissible for any purpose).

■ There are two reasons why offers of settlement and compromise traditionally have not been admissible to prove liability

2. The same day, Garcia sued Sharma on the promissory note. The parties settled out of court.

3. These disciplinary rules are found in Appendix A to D.C.App.Rule X (Rules of Professional Conduct), 1 D.C.Court Rules Ann. 164 (1989). They have been supplanted by the District of Columbia Rules of Professional Conduct effective January 1, 1991. *See* 1 D.C.Court Rules Ann. 146 (1991).

4. Presumably, any damages based on a valuation of the leasehold interest would be subject to

diminution (or conceivably enhancement) by reference to the difference in rent the tenant would have to pay over the term of the lease to rent alternative premises.

5. In the landlord-tenant action, the trial court had admitted this evidence. Sharma had introduced the offers to purchase as evidence that Llerena's allegations about lease violations were a pretext to hide his true aim: to free the leased property of tenants in order to sell the property to GHA. Although the trial court in the landlord-tenant action admitted the evidence, it was

or damages.[6] First, such offers are of questionable relevance, since they readily may be "construed as a desire for peace rather than an admission of weakness of position." E. CLEARY, MCCORMICK ON EVIDENCE § 274 at 811 (3d ed. 1984); *see Pyne,* 497 A.2d at 127; *Harrison v. District of Columbia,* 95 A.2d 332, 334 (D.C.1953). Second, the rule furthers the policy of promoting the settling of disputes, which would be discouraged if settlement offers were admissible in evidence. *See Pyne,* 497 A.2d at 127; E. CLEARY, MCCORMICK ON EVIDENCE § 274 at 811.

■ To invoke this rule of inadmissibility, there must have been an actual dispute over the validity or amount of the claim when the offer was made. *See id.* That requirement is met here, since Llerena and Sharma disputed the validity of Llerena's allegations that the tenant was in default under two provisions of the lease.

■ Garcia relies on this court's decision in *Auxier v. Kraisel,* 466 A.2d 416 (D.C.1983), to take Llerena's offers to the Sharmas outside the traditional rule. In that case, a real estate broker contracted to sell a rowhouse on behalf of the owner to an investment company. The owner eventually refused to go through with the sale because his broker had agreed to an inadequate price. The contract purchaser sued for specific performance, and the owner settled for $12,500. The owner then sued his broker for breach of fiduciary duty and sought to introduce as evidence of damages his $12,500 settlement with the contract purchaser. The trial court admitted the evidence, and we sustained the ruling:

> Because the settlement evidence at issue here was introduced to show the amount of damages incurred by reason of underlying litigation with a third party, and not as an admission by appellant of liability or of the amount of damages in the

instant litigation, the traditional rule of inadmissibility was inapplicable.

*Id.* at 419–20.

In the present case, in contrast, Garcia sought to introduce Llerena's offers to Sharma as a way of proving the value of the leasehold. His theory was to postulate that, as optionee, he stood in Sharma's shoes and thus could use Llerena's offers to Sharma as "an admission by [Llerena] ... of the amount of damages in the instant litigation." *Id.* at 420. For that reason, the traditional rule of inadmissibility is applicable here, rather than the *Auxier* exception, and the court did not err in excluding the proffered evidence.

### III. THE DIRECTED VERDICT

■ We next review the grant of a directed verdict. In doing so, we view the facts, as the trial court did, in the light most favorable to the non-moving party. *See Washington v. A & H Garcias Trash Hauling,* 584 A.2d 544, 545 (D.C.1990). A " 'plaintiff is not required to prove the amount of his [or her] damages precisely; however the fact of damage and a reasonable estimate must be established.' " *Bedell v. Inver Housing, Inc.,* 506 A.2d 202, 205 (D.C.1986) (quoting *W.G. Cornell Co. v. Ceramic Coating Co.,* 200 U.S.App.D.C. 126, 129, 626 F.2d 990, 993 (1980)). Accordingly, although the plaintiff need not prove damages " 'with mathematical certainty, there must be some reasonable basis on which to estimate damages.' " *Bedell,* 506 A.2d at 205 (quoting *Romer v. District of Columbia,* 449 A.2d 1097, 1100 (D.C.1982)). Where the plaintiff proves a breach of contractual duty but the proof of damages is vague or speculative, he is entitled only to nominal damages.[7] *See id.*

■ The initial measure of damages in a case where a landlord has failed to fulfill his or her obligations under a lease[8] is set

---

not swayed by it, for the court ruled in favor of the landlord.

**6.** We have not formally adopted Fed.R.Evid. 408, which codifies the traditional rule excluding offers of settlement and compromise.

**7.** Appellant did not seek nominal damages in this case.

**8.** Although the Option to Assume Lease Agreement was not a lease, as such, this case presents a situation in which the landlord failed to fulfill his obligations to an optionee entitled to assert the rights of a tenant-assignee.

out in the RESTATEMENT (SECOND) OF PROPERTY, LANDLORD & TENANT § 10.2 (1977) ("RESTATEMENT"). One measure is the fair market value of the lease, *see id.* at § 10.2(1), which may be ascertained by calculating the difference between the reasonable rental value of the property for the remainder of the term, as objectively determined by an appraisal, and the agreed rent. *See id.,* comment b & illustration 1; *Thomas v. Amoco Oil Co.,* 455 So.2d 1187, 1193 (La. Ct.App.1984) (fair rental value of leased property determined by amount of rent lessor receives after breach from successor lessee or by expert testimony or evidence of rental values of comparable property). Similarly, the injured tenant's measure of damages when a lessor has broken a contract to make a lease is "the difference between the rental value of the property for the period or term of the lease, and the agreed rent." 11 WILLISTON ON CONTRACTS § 1404A at 566 (3d ed. 1968); *see Lanzalotti v. Cohen,* 113 So.2d 727, 731 (Fla.App.) *cert. denied,* 116 So.2d 772 (Fla.1959). In sum, a tenant who is forced by the landlord's breach to give up a lease will incur compensable damages only to the extent that the tenant has to pay more for comparable space over the term of the original lease.

Garcia, the injured tenant by virtue of Llerena's failure to notify him of his option to cure and assume the lease, failed to introduce any evidence to support a finding of damages according to this rule. The Llerena–Sharma lease itself was introduced in evidence, but Garcia offered no appraisal of its fair market value and no evidence of the rent Garcia would have had to pay for comparable premises to re-open the restaurant. Only by comparing such an alternative rent structure with the agreed rent under the Llerena–Sharma lease could Garcia have established damages from loss of the leasehold as such.

▆▆▆▆ But Garcia's principal damages allegedly were from loss of an opportunity to resume operation of a profitable restaurant, *i.e.,* loss of his bargained security to prevent loss of the anticipated profit from selling the restaurant to Sharma. The RESTATEMENT includes loss of anticipated business profits as another measure of damages for a landlord's breach of a lease provided they are "proven to a reasonable degree of certainty"[9] and the landlord "could reasonably have foreseen [they] would be caused by the default." *See* RESTATEMENT § 10.2(5). Professor Williston confirms that

> [w]here circumstances warrant, loss of profits may be included as an element of special damages, but only where these are fairly certain and can be ascertained, not where wholly in prospect and contemplation and thus conjectural and speculative.

11 WILLISTON ON CONTRACTS § 1404A at 566 (footnote omitted); *see also Palmer v. Albert,* 310 N.W.2d 169, 174 (Iowa 1981) (upholding lost profits award in landlord's breach of contract to lease property where tenant had established proof of lost profits by testimony of two expert witnesses); *Lanzalotti,* 113 So.2d at 731–32 (reversing lost profits award where negotiations over sale of motel to be built on leased property had not been concluded). Garcia had the burden of establishing with reasonable certainty the anticipated profits he lost by Llerena's failure to abide by the option agreement. *See* RESTATEMENT at § 10.2 comment f. He presented no evidence, however, to support a claim that his lost profits were "reasonably certain" or "fairly certain" and ascertainable.

Garcia testified that when he had operated a restaurant on the leasehold premises, he grossed about $800 a day and his net return was approximately a third of that figure.[10] He derived this estimate of his net income by relying not on his actual income and obligations but, in the trial court's words, on "some formula that a

---

9. "[T]he phrase 'reasonable certainty' has been interpreted to 'require only that the damages be taken out of the realm of speculation' ... The calculation of lost profits[, however,] must be based upon evidence which leads to a reasoned conclusion." *Young v. Scott,* 108 Idaho 506, 700 P.2d 128, 132 (Idaho Ct.App.1985) (citations omitted).

10. Garcia's testimony, referring to his $800–per-day gross income, was: "I guess net is about one-third of it."

third is something that you take home as net." Sharma similarly testified that he grossed approximately $800 a day, and he, too, referred to a one-third formula to derive his net income. He did not use actual income or expense figures.[11]

Garcia, however, did not lay any foundation or identify any source for the formula he and Sharma relied upon in estimating their net returns from their restaurant businesses. As the trial court correctly indicated, "We haven't had one piece of paper. We haven't had one book. We haven't had one record." Furthermore, Garcia's and Sharma's respective restaurant operations on the same property were entirely different in character. Garcia had originally operated the restaurant as a daytime carryout, with seating for eighty persons, a jukebox, and a few pinball machines. Sharma, on the other hand, expanded the operation to include a sit-down bar, a cafeteria line, music, and a small dance floor. He also obtained a liquor license, and the establishment remained open until midnight. Even if Garcia could and would have run the restaurant for the remaining term of the lease as Sharma had operated it until his eviction, the only basis for measuring the profits of the business was the mysterious "one-third of gross" formula which both Garcia and Sharma testified they had applied to their identical $800-a-week gross incomes.[12] In short, appellant failed to introduce evidence of damages that would have permitted the jury to come to an award for lost profits based on anything but speculation. *See* *Cahn v. Antioch University,* 482 A.2d 120, 130 (D.C.1984) (where proof is vague and speculative, plaintiff is entitled only to nominal damages).

This court's recent decision in *Sastry v. Coale,* 585 A.2d 1324 (D.C.1991), does not require a different result. In *Sastry,* the plaintiff proved the existence and completion of a valid contract for his services. The only question was how much he was entitled to be paid. The defendant contended that the contract called for payment out of the profits of the enterprise—of which there were none—while the plaintiff argued that he was to have worked on a fee-for-service basis. The plaintiff proved that he was not working under a contingent fee contract by showing that he had received several interim payments for his services under that contract, as well as a payment from another individual for similar services. *Id.* at 1329. We concluded that these payments amounted to "some probative evidence" on the issue of the market value of his services; these were enough, we said, to "furnish[ ] a nonspeculative basis on which the jury could determine what additional compensation, if any, he was owed for his services." *Id.* We therefore reversed the grant of directed verdict for the defendant.

11. Sharma also testified that the fair market value of his restaurant as a going concern was $300,000, based on frequent visits by a real estate broker and on "the location, lease, and physical appearance of the restaurant and the crowd itself. It was a professional, white collar, high-income people who was monitoring that place." Garcia testified that if Llerena had notified him of Sharma's default, he could have exercised his right "under the promissory note agreement to take over the business and run it and get Mr. Sharma out of the business place and run it my own self." Garcia then testified that he could have sold the business for "$140,-000 plus or better, if [he] had not wanted to run it again." Neither of these estimates of going concern value is relevant to damages for lost profits, if only because such valuations include capital investment and, perhaps, good will representing a premium attributable to intangibles.

12. Without losing sight of the requirement that we view the evidence in the light most favorable to appellant, *see A & H Garcias Trash Hauling,* 584 A.2d at 545, we note that Sharma testified on cross-examination that he netted about $5,500 a month. He then reduced that figure, indicating that he made $5,500 *before* he paid his employees and that he paid them $3,500 a month. He then testified that the actual net for the business was lower still because, out of the $5,500, he paid himself for his own labor an amount that varied from week to week, month to month, and year to year. Sharma also indicated that he owns several restaurants, that sometimes he supports one restaurant with the others, and that "maybe [his] record was not that good." He admitted testifying in a deposition that he grossed about $2,000 a week. Hence, Sharma altered his own estimates, rendering the one-third of $800-per-day figure of little value against a standard of "reasonable certainty."

Garcia, on the other hand, has not alleged that he provided services to Llerena for which he has not been paid; Garcia's claim is not based on unjust enrichment. We thus are not faced, as we were in *Sastry*, with a contract substantially performed by one party and initial payments by the other party to support the value claimed. We are presented, rather, with an agreement reflecting no history of demonstrated value of the restaurant business to Sharma or to Garcia.

In sum, we agree with the trial court that Garcia failed to present evidence of damages upon which the jury could have based an award without resorting to guesswork. Without evidence of fairly certain, ascertainable damages, the court did not err in granting a directed verdict in Llerena's favor.

### IV. ATTORNEY DISQUALIFICATION AND ATTORNEY REFUSAL TO TESTIFY

■ Garcia contends the trial court erred in refusing to disqualify attorney Musolino for violating disciplinary rules which, with exceptions not relevant here, forbid an attorney to accept (DR 5–101(B)) or continue (DR 5–102(A)) a representation in litigation if the attorney knows, or it is obvious, that the attorney (or an attorney in his or her firm) ought to be called as a witness for the client.

On this record, the only possible issue arises under DR 5–102(A). After the litigation had begun, Garcia listed Musolino in his pretrial statement as a potential fact witness. Noting the problem, Judge Nunzio told counsel to work it out between themselves. As it turned out, with one exception that came to light on the eve of trial, every fact that Garcia's counsel wanted to establish through Musolino's testimony was established by other witnesses. The exception was counsel's desire, announced for the first time on the day of trial, to prove damages in part by introducing evidence, through Sharma, that on two occasions Musolino personally had made $100,000 offers on behalf of Llerena to purchase G.O., Inc.'s rights under the lease. Out of the presence of the jury, Musolino denied making such offers and argued that Garcia should not be allowed

to elicit such testimony because there had been no indication of it during pretrial discovery. Musolino acknowledged that, if the court were to allow the evidence, either he or a member of his firm would have to take the stand to deny that any $100,000 offer had been made.

The court excluded the testimony on another ground we have sustained, *supra* in Part II: that settlement offers, as such, were inadmissible. The DR 5–102(A) problem therefore evaporated. We accordingly discern no abuse of discretion in the court's denial of Garcia's motion to disqualify. It follows that the court did not abuse its discretion in refusing to require Musolino to testify.

■ We reach a similar conclusion concerning the trial court's refusal to allow Garcia to call Lisa Dessel, Esq., who was associated with Musolino, as a fact witness. Garcia's counsel had concluded that her testimony would be unnecessary if the defense stipulated that she had authored a particular agreement between Llerena and Sharma at the time of Sharma's eviction. Although Garcia's counsel later changed his mind, arguing that Dessel's testimony was necessary to interpret the agreement, we perceive no abuse of discretion in the court's declaring that the document spoke for itself and thus in refusing to require Dessel to testify.

*Affirmed.*