896 F.Supp. 199 (1995)
Smita Arun PATEL, Plaintiff,
v.
HOWARD UNIVERSITY, Defendant.
Civ. A. No. 92-2704 SSH.
United States District Court, District of Columbia.
August 1, 1995.
*200 Jeffrey Stuart and Gary R. Alexander, Alexander & Cleover, Fort Washington, MD, for plaintiff.
Jeffrey Ford, Associate General Counsel, Howard University, Washington, DC, for defendant.

OPINION
STANLEY S. HARRIS, District Judge.
Plaintiff, now a licensed physician in the State of Maryland, worked in a residency program in the Department of Anesthesiology at Howard University Hospital ("Howard") from 1987 to 1990. She alleges that she entered into a series of three one-year employment contracts with Howard under which Howard was to provide plaintiff with advanced training and education in anesthesiology as a postgraduate physician. Plaintiff alleges that defendant Howard University breached the second and third contracts by: (1) denying her credit for her third year of postgraduate work (PGY-3/CA-2) and refusing to permit her to progress to the fourth and final year of postgraduate work; and (2) failing to accord plaintiff the procedural protections set forth in the contracts regarding performance evaluations and notice of nonrenewal. Plaintiff also alleges that defendant was negligent in failing to maintain a performance evaluation system adequate to fairly evaluate postgraduate physicians.[1]
The Court held a two-day bench trial beginning on April 19, 1995.[2] This Opinion sets forth the Court's findings of fact and conclusions of law as required by Fed.R.Civ.P. 52(a). Based on the credible evidence presented at trial, the Court finds that defendant did breach some of the terms of the contracts, but that defendant was not negligent in its administration of the performance evaluation system. However, the Court also finds that plaintiff did not suffer damages as a result of the breach, and, therefore, awards only nominal damages in the amount of one dollar.

Findings of Fact
Plaintiff was trained in medicine and anesthesiology in India. In 1980, she immigrated with her husband to the United States, where plaintiff intended to enter a residency program in anesthesiology. Because she received her medical training in a foreign country, she was required to take the Educational Commission for Foreign Medical Graduates Examination, which she took and passed in 1981. In 1987, plaintiff was accepted into Howard's residency program in the Department of Anesthesiology ("Department").

A. The Course of Plaintiff's Residency
In the normal path of a resident's training, the resident completes a "clinical base year"  the first year of postgraduate work, also referred to as PGY-1before specializing in a field such as anesthesiology. Because of plaintiff's educational background, Howard decided to waive the clinical base year, and allow plaintiff to start her training as a second-year postgraduate physician (PGY-2) and first-year resident in clinical anesthesiology (CA-1).
Accordingly, on March 24, 1987, Howard offered and plaintiff accepted an appointment as a PGY-2/CA-1 resident in anesthesiology for the period June 26, 1987, to June 25, 1988. Plaintiff completed and was given full credit for this year, and this contract is not in dispute.
On February 19, 1988, Howard offered and plaintiff accepted an appointment as a PGY-3/CA-2 for the period July 1, 1988, to June *201 30, 1989 ("1988-1989 contract"). During this term, by letter dated December 27, 1988, plaintiff was placed on probation because of poor performance, and was informed that failure to improve would result in nonrenewal of her contract for the fourth year of postgraduate work. Her probation notwithstanding, on February 27, 1989, Howard offered and plaintiff accepted an appointment as a PGY-4/CA-3 for the period July 1, 1989, to June 30, 1990 ("1989-1990 contract").
On April 26, 1989  two months after the PGY-4/CA-3 contract for 1989-1990 had been signed  Dr. Olly Duckett, Chairman of the Department's Competence Committee, notified plaintiff that she would be required to repeat nine months of the PGY-3/CA-2 year, incorporating three months of general medicine, because of unsatisfactory performance. The reason Howard initially renewed plaintiff's contract for the fourth year, yet then required plaintiff to repeat the third year, is that renewal decisions generally are made several months in advance of the next contract year, which starts on July 1. Because of plaintiff's continued poor performance during the interim period, Howard decided to modify its decision.
By letter dated June 8, 1989, plaintiff requested reconsideration of the decision. By letter dated June 27, 1989, Dr. Kwesi Edusei, Chairman of the Education Committee, informed plaintiff that the Department had held a faculty meeting on June 9, 1989, and that her request for reconsideration had been denied.
As a result of the April 26, 1989, notice, plaintiff worked in general medicine from July 1, 1989, to October 1, 1989, and repeated nine months of her PGY-3/CA-2 year from October 1, 1989, to June 30, 1990.
By letter dated December 21, 1989, Dr. Melville Wyche, Chairman of the Department of Anesthesiology, informed plaintiff that she would not be offered a reappointment for the period beginning July 1, 1990, because "[her] progress in the area of anesthesia [was] minimal to nonexistent." Because of plaintiff's poor performance, plaintiff also was not given credit for her PGY-3/CA-2 year.
By letter dated May 22, 1990, plaintiff appealed her termination from the program. On May 25, 1990, a faculty meeting was held, and the faculty voted to uphold the termination. Plaintiff was informed of the decision by letter dated June 27, 1990.

B. The Deficiencies In Plaintiff's Performance That Resulted In Her Termination
The evidence at trial overwhelmingly demonstrated that plaintiff was sorely lacking in her fund of knowledge and failed to make any progress in learning. These deficiencies were demonstrated by the testimony of Department faculty members Dr. Barbara Roberts, Dr. Kwesi Edusei, and Dr. Melville Wyche; the performance evaluations; and plaintiff's standardized test scores.[3] The testimony of the doctors indicated that, overall, plaintiff was competent in the "technical," i.e., manual, aspects of anesthesiology, but lacked the knowledge base, judgment, and analytical skills that are required. As Dr. Wyche testified, competence in the technical aspects of anesthesia, i.e., executing the procedures, can be achieved without an adequate knowledge base. Thus, for example, nurses can and do perform many anesthesia procedures; similarly, plaintiff was allowed to perform many anesthesia procedures  and performed them well  despite her deficient knowledge base. However, the distinguishing characteristic of a physician  knowledge and judgment  were qualities in which plaintiff was significantly lacking.[4]
*202 The evaluations indicate that, overall, plaintiff's fund of knowledge was poor and her progress was minimal. See Defendant's Exs. 3a-3e (Evaluations of Plaintiff by Drs. Edusei, Roberts, Lim, Kulkumar, and Burruss).[5] The testimony of Drs. Roberts and Edusei elaborated on the problems mentioned in the evaluations. Plaintiff's fund of knowledge was deficient from her start in the program because plaintiff was not required to do the clinical base year, PGY-1  an erroneous decision, in Dr. Roberts's opinion. This deficiency was compounded by plaintiff's failure to do much of the required reading due to personal problems in plaintiff's home life. Specifically, plaintiff's parents-in-law were living at home with plaintiff and her husband, and, due to certain Indian customs, this living arrangement made it difficult for plaintiff to reserve an adequate amount of time for her reading, which is essential to building up a knowledge base.[6]
In addition to performance evaluations, plaintiff's standardized test scores indicated both a severe deficiency in plaintiff's fund of knowledge and a failure to progress in her learning. Each year, the residents take a national standardized test called the in-training examination, sponsored by the American Board of Anesthesiologists and the American Society of Anesthesiologists ("ABA/ASA In-Training Exam"), an exam that prepares the residents for the certification examination administered by the ABA ("boards" or "board certification").[7] The ABA/ASA In-Training Exam is administered every July. The grades are returned by the following October, and are made available to the residents. When the scores are extremely low, as plaintiff's were, an attending staff physician meets with the resident to discuss the test. Howard considers these tests very important because one of the primary goals of the Department's residency program is to prepare its residents for board certification, without which it is extremely difficult to obtain an anesthesiologist position. Aside from preparation for board certification, the test also is a good indicator for measuring a resident's fund of knowledge on anesthesiology.
In 1987, plaintiff scored in the 1st percentile. That means that 98% of the other test-takers nationwide scored higher than plaintiff. Plaintiff answered 25% of the questions correctly. In 1988, plaintiff scored in the 0 percentile, which means that 99% of the test-takers scored higher than plaintiff. Plaintiff then answered 30% of the questions correctly. In 1989, plaintiff again scored in the 0 percentile. This time, she answered only 29% of the questions correctly. Dr. Wyche and Dr. Roberts explained that a low score in the first year is not cause for serious concern because it shows only that, entering the program, the resident has a low knowledge base. It does not show an inability or unwillingness to improve. However, the expectation is that the resident will learn and progress, and the scores will go up each year. When plaintiff's scores remained at essentially the same low level for in 1988, Dr. Roberts met with plaintiff to discuss plaintiff's deficiencies.
*203 In addition to poor evaluations and poor test scores, all of which stemmed from the deficiencies in plaintiff's fund of knowledge, plaintiff demonstrated a lack of honesty which Howard considered very serious and was reflected in plaintiff's record. Dr. Roberts described one incident when plaintiff indicated on a patient's chart that plaintiff had examined the patient when, in fact, plaintiff had not conducted an examination. Dr. Edusei related a similar incident in which plaintiff lied about obtaining vital information from a patient.[8] On another occasion, Dr. Edusei discovered that plaintiff had lied about administering medicine to a patient in the operating room.[9]

C. The Contract Provisions on Performance Evaluations and Nonrenewal Decisions and Howard's Implementation Thereof
In order to communicate to the residents how they were performing in the program, Howard set up a performance evaluation system and a procedure for nonrenewal of contracts. Section VIII of each of the contracts specified the following:
1. Periodic evaluations of the Postgraduate Physician's educational progress and competence shall be made in writing as the Postgraduate Physician advances in medical training. The evaluations shall be forwarded to the Department's Educational Committee.
2. Each Department shall establish at least a three (3) member Educational Committee, whose composition shall be made known to each Postgraduate Physician. Any deliberations of this Committee shall be made available to any Postgraduate Physician so evaluated. The progress of each Postgraduate Physician shall be evaluated every two (2) months. The evaluations shall include specific information as to deficiencies observed.
3. Not less than six (6) months prior to the end of this agreement, the Program Director shall transmit to each Postgraduate Physician in the Program a written evaluation of performance, including notice if the Department will not continue the Postgraduate Physician in the Program. In the event that the Department has made a decision not to permit a Postgraduate Physician to continue in the Program, the Program Director shall give the Postgraduate Physician written notice of that decision containing reasons for the Department's decision at the time of this evaluation.
See Section VIII of 1988-1989 Contract and 1989-1990 Contract (Plaintiff's Exs. 2 & 3) (emphasis in original).
Plaintiff alleges that the performance evaluation system did not meet the requirements of Section VIII or, alternatively, that the system was inadequate to fairly evaluate the residents. The testimony of Drs. Wyche, Roberts, Edusei, and Kulkumar indicate that the performance evaluations were administered as follows. The attending staff physicians *204 who supervised residents were given an evaluation form to fill out on each resident with whom he or she had worked. Although the attending staff physicians were aware that they were expected to fill out a form on each resident every two months, some of the staff physicians did not complete the forms on a regular basis  a problem experienced at many teaching hospitals. Although there were no written procedures or guidelines on how to fill out the form, it was in large part self-explanatory. For example, it was divided into three sections  judgment, clinical skills, and general skills  with specific skills which the attending is to evaluate. The staff physician may rate the resident "outstanding," "satisfactory," "needs improvement," or "unsatisfactory," each of which has a point value attached to it. The points are totaled at the bottom of the form  although, as Dr. Wyche testified, the points, by themselves are not significant  and there is a space for comments.
Although the evaluations were not completed as routinely as required by the contract, i.e., every two months, plaintiff received substantial guidance and counseling from the attending physicians. Dr. Roberts and Dr. Edusei each had several meetings with plaintiff because of the problems in her progress and knowledge base.[10] Dr. Roberts met with plaintiff "many times" to emphasize that it was essential for plaintiff to do more reading to expand her very limited fund of knowledge and to urge plaintiff to work out her problems at home so as to allow more time for studying. On at least two occasions, Dr. Roberts discussed plaintiff's In-Training Exam scores with plaintiff and the complete lack of progression the scores showed. Dr. Edusei met with plaintiff several times because Dr. Edusei felt that plaintiff had lied to him. On at least one of these occasions, Dr. Edusei reviewed all of the evaluation forms on plaintiff with her. Dr. Edusei also discussed plaintiff's probationary status with her, and emphasized that, if plaintiff did not improve, she would be terminated. Furthermore, as Dr. Wyche pointed out, even if plaintiff had not read any of the negative evaluations, she was aware that she was on probation by December 1988, and she was aware that she was being required to repeat her PGY-3/CA-2 year. Finally, in a program with only 13 residents and 13 faculty members  a one-to-one ratio  it would have been impossible for plaintiff to be unaware that her performance was not satisfactory.

Conclusions of Law

A. Performance Evaluations

1. Section VIII(1) and (2)
Section VIII(1) requires Howard to make "periodic evaluations" in writing of plaintiff's "education progress and competence," and Section VIII(3) further specifies that these evaluations are to be made "every two months." The contracts also required that the deliberations of the Department's Educational Committee be made available to all postgraduate physicians. As discussed supra, the testimony at trial indicated that, although attempts were made to complete evaluations every two months, this practice was mostly, but not always, observed. The testimony also indicated that the deliberations of the Educational Committee were not always made known to the residents. Accordingly, the Court concludes that Howard, as a technical matter, breached Section VIII(2).
The testimony also overwhelmingly indicated, however, that plaintiff was made *205 aware of the deficiencies in her performance by the staff physicians and repeatedly was advised to improve in her areas of deficiency, which were mainly in her knowledge base of anesthesiology, her inability to progress, and dishonesty. The staff physicians' personal meetings with plaintiff did not result in any improvement. This lack of improvement likely was due to several factors: (1) Howard's decision to waive plaintiff's clinical base year was, in retrospect, an erroneous one, which had left plaintiff beginning with a severe knowledge handicap; (2) plaintiff was experiencing personal problems in her home life; and (3) related, plaintiff was not reading the required course materials.
Considering that the direct and personal meetings with staff physicians failed to lead to an improvement in plaintiff's performance and that the external factors most likely were at the root of plaintiff's poor performance, the Court finds that the evidence indicates that the completion of performance evaluations every two months would not have resulted in plaintiff's improvement, nor would publication of the deliberations of the Educational Committee. Thus, the Court finds that Howard's breach did not cause plaintiff any loss.[11] Because plaintiff suffered no loss as a result of the breach, she may recover only nominal damages.[12]See Garcia v. Llerena, 599 A.2d 1138, 1142 (D.C.1991) (noting that plaintiff must prove "the fact of damage"; "where plaintiff proves a breach of a contractual duty but the proof of damages is vague or speculative, he is entitled only to nominal damages."); Cahn v. Antioch Univ., 482 A.2d 120, 130 (D.C.1984) (same); Restatement (Second) of Contracts § 346(2) ("If the breach caused no loss ..., a small sum fixed without regard to the amount of loss will be awarded as nominal damages"). One dollar is an appropriate amount for nominal damages. See Wisconsin Ave. Assocs., Inc. v. 2720 Wisconsin Ave. Coop. Ass'n, Inc., 441 A.2d 956, 961 (D.C.) (indicating that, under District of Columbia law, one dollar is the appropriate amount for an award of nominal damages), cert. denied, 459 U.S. 827, 103 S.Ct. 62, 74 L.Ed.2d 64 (1982); Christopher v. Shapiro, 116 A.2d 583, 584 (D.C.1955) (same); see also Stevenson v. Economy Bank of Ambridge, 413 Pa. 442, 197 A.2d 721, 727 (1964) (noting that "[n]ominal damages represent the award of a trifling sum where there has been a breach of duty ... but no real substantial or serious loss has been established"). Accordingly, the Court awards plaintiff one dollar.

2. Negligence
Plaintiff also alleges that the performance evaluation system was negligently operated. To establish a cause of action for negligence, plaintiff must allege: (1) a duty of care owed by defendant to plaintiff; (2) a breach of that duty by defendant; and (3) damage to plaintiff, which is (4) proximately caused by defendant's breach of duty. See Powell v. District of Columbia, 634 A.2d 403, 406 (D.C.1993). Plaintiff has failed to show the third and fourth elements. As discussed supra, the system of administering performance evaluations did not cause plaintiff damage. Plaintiff's poor performance was caused by other extraneous factors.[13] Moreover, the evidence overwhelmingly demonstrated that a better evaluation system would not have resulted in improvement, considering that plaintiff had been made acutely aware of the deficiencies in her performance.

B. Section VIII(3): The Six-Month Notice Requirement
First, plaintiff alleges that the April 26, 1989, notice requiring plaintiff to repeat nine months as a third-year postgraduate physician violated Section VIII(3) of the *206 1988-1989 contract. Section VIII(3) requires the Department to give plaintiff at least six months' notice when the Department decides that "[it] will not continue the Postgraduate Physician in the Program."
District of Columbia law "adheres to the `objective law of contracts,' whereby the `written language embodying the terms of an agreement will govern the rights and liabilities of the parties, irrespective of the intent of the parties at the time they entered the contract,'" unless the written contract is ambiguous. Howard Univ. v. Best, 484 A.2d 958, 967 (D.C.1984). Whether a contract is ambiguous is a question of law for the Court. Dodek v. CF 16 Corp., 537 A.2d 1086, 1093 (D.C.1988). "Contracts are not rendered ambiguous by the mere fact that the parties do not agree upon their proper construction." Id. (quoting Holland v. Hannan, 456 A.2d 807, 815 (D.C.1983)). Ambiguity exists only if the evidence supports more than one reasonable interpretation. Ozerol v. Howard Univ., 545 A.2d 638, 642 (D.C.1988), reh'g granted on other grounds, 555 A.2d 1033 (D.C.1989).
The Court finds that the written contract can support only one interpretation. This six-month notice requirement, by its terms, only applies when a resident will not be permitted "to continue in ... the program." The April 26, 1989, notice requiring plaintiff to repeat part of her third year, in contrast, clearly allowed plaintiff to continue in the Program. Therefore, the six-month notice requirement does not apply, and Howard is not in breach thereof.

C. The 1989-1990 Contract for PGY-4/CA-3
Plaintiff alleges Howard breached this contract, under which the parties agreed that plaintiff would be allowed to proceed to the fourth and final year of postgraduate work, PGY-4/CA-3. About two months after signing this contract, Howard informed plaintiff that she would be required to repeat her PGY-3/CA-2 year, and therefore, would not be permitted to proceed to the PGY-4/CA-3 year. This action constituted a technical breach  or perhaps more accurately, a rescission  of the 1989-1990 Contract.
Again, however, plaintiff is entitled only to nominal damages. See supra Part A.1. Plaintiff's contention that she is entitled to the salary of an anesthesiologist for the three years that she ultimately was unemployed is wholly unsupported by the evidence. Where the proof of damages is vague or speculative, a plaintiff is entitled only to nominal damages. See Garcia, 599 A.2d at 1142. Such is the case here.
The evidence overwhelmingly indicates that, even if plaintiff had been permitted to progress to the PGY-4/CA-3 year, plaintiff would not have received credit for this year because of her poor performance, inability to progress, and lack of an adequate knowledge base. Because she would not have received credit for the final year of her residency, she could not have been hired as an anesthesiologist.
Assuming arguendo that Howard would have given plaintiff credit for the PGY-4/CA-3 year, the record indicates that plaintiff would not have been hired as an anesthesiologist. First, she would not have been able to obtain board certification. This conclusion is strongly supported by the fact that plaintiff consistently scored in the lowest possible percentiles  0% and 1%  on the ABA/ASA In-Training Exams. Although board-certification is not a requirement for becoming an anesthesiologist, many hospitals do require it, and it is necessary to be considered a serious candidate for a position.[14] Second, plaintiff's consistently poor performance at Howard indicates that she would not be a competitive candidate for anesthesiologist positions. Finally, plaintiff had unfavorable recommendations from the Department of Anesthesiology, which also would have greatly reduced her chances of obtaining an anesthesiologist position. Therefore, even if Howard had allowed plaintiff to complete its residency program, there is very little evidence  certainly, not a preponderance of the evidence  to indicate that plaintiff *207 could have obtained a position as an anesthesiologist.[15]

Conclusion
Upon consideration of the foregoing, judgment is entered for defendant on Counts One and Six. Judgment is entered for plaintiff on Counts Two and Three. The Court concludes that plaintiff is entitled only to nominal damages in the amount of one dollar. An appropriate Order accompanies this Opinion.

ORDER
For the reasons stated in the accompanying Opinion, it hereby is
ORDERED, that judgment is entered for defendant on Counts One and Six. It hereby further is
ORDERED, that judgment is entered for plaintiff on Counts Two and Three. It hereby further is
ORDERED, that plaintiff is awarded nominal damages in the amount of one dollar. It hereby further is
ORDERED, that plaintiff's motion for reconsideration of the April 19, 1995, Order dismissing Count Four is denied.
SO ORDERED.
NOTES
[1] Plaintiff also brought four other counts: violation of the common law right to fair procedure (Count Four), violation of due process (Count Five), intentional infliction of emotional distress (Count Seven), and negligent infliction of emotional distress (Count Eight). These counts were dismissed for the reasons stated in the Orders issued on April 5 and April 19, 1995. The Court denies plaintiff's motion to reconsider the dismissal of Count Four.
[2] Both sides waived the right to a jury trial on the day of trial.
[3] The Court does not rely on the testimony of Dr. Reginald Penniston, a cardiac and thoracic surgeon, with whom plaintiff briefly worked. He testified that he could not judge plaintiff's work as an anesthesiologist because his knowledge of anesthesiology was "woefully limited."
[4] The testimony of Dr. Anilkumar Kulkumar was not inconsistent with the testimony of the other doctors who worked with plaintiff. Although he praised her execution of procedures  the "technical" aspect of medicine  this testimony is not inconsistent with the overwhelming weight of the evidence that plaintiff lacked an adequate knowledge base and the ability to progress. See also Plaintiff's Ex. 16 (letter of recommendation from Dr. Kulkumar focusing on plaintiff's "superior technical skills" and collegiality). Although Dr. Kulkumar testified that her fund of medical knowledge was "good," he also testified that "frequently she did not know the answers." To the extent that Dr. Kulkumar's testimony indicated that plaintiff had an adequate knowledge base, this testimony is inconsistent with his own testimony, and completely at odds with plaintiff's low standardized test scores and the uncontradicted testimony of Dr. Roberts that plaintiff was not keeping up with the reading. Accordingly, the Court finds it not credible.
[5] Drs. Edusei, Roberts, and Burruss repeatedly noted on the evaluations that plaintiff's fund of knowledge was severely lacking and that her progress was very poor. Their comments were quite consistent with each other. Dr. Luke Lim and Dr. Kulkumar evaluated plaintiff, for the most part, as satisfactory, but with few comments.
[6] Although plaintiff did not mention any personal problems that detracted from her performance, both Dr. Roberts and Dr. Edusei testified that plaintiff had discussed with them her problems with her parents-in-law  mainly, the demands made by her mother-in-law and the adverse effects of this on her ability to study. Plaintiff did not rebut their testimony.
[7] Plaintiff also took the Anesthesia Knowledge Test (also referred to as the AKT), another standardized test, several times. Because the testimony on this exam was sparse, the Court does not rely on it. In any event, the In-Training Exam, which was the method of preparation for board certification, clearly was the more important test.
[8] He directed plaintiff to do a preoperative assessment and, specifically, to find out the most recent time a patient had eaten. (Ingestion of food by the patient before receiving anesthesia may cause very serious complications, so hospitals routinely check the patient's most recent meal.) Plaintiff responded that the patient had last eaten the night before at midnight. Dr. Edusei discovered from the ward desk attendant that the patient actually had last eaten at breakfast that morning, and that plaintiff had only read the patient's chart and left without checking on the patient directly. When Dr. Edusei confronted plaintiff with this information, plaintiff denied the allegations, and further lied, saying she must have checked the wrong room. Dr. Edusei pressed the issue, and plaintiff burst into tears. It was at this point that plaintiff disclosed that she had personal problems at home.
[9] Specifically, Dr. Edusei observed on a monitor that the patient's heartbeat rate had increased. He left the room, and several minutes later, when he returned, it had slowed down without explanation. Dr. Edusei asked plaintiff whether she had done anything to cause this, and plaintiff responded that she had not. Dr. Edusei then discovered propenol in the trash can, which plaintiff denied giving to the patient. Plaintiff told Dr. Edusei that she had given it to a patient earlier that day. Because Howard has a policy of emptying out the trash can after each patient, and the decrease in heartbeat rate was unexplainable without the propenol, he concluded that she had lied.
[10] The Court notes that, on the issue of whether plaintiff was informed of the deficiencies in her fund of knowledge and progress in learning, the Court completely discredits the testimony of plaintiff and fully credits the testimony of Drs. Roberts and Edusei. Plaintiff testified that she was under the impression that she was doing very well in the residency program and that the attending physicians told her she was doing well; that no one discussed her low In-Training Exam scores with her; and that no one discussed her probationary status with her. This is in direct contradiction to the testimony of Drs. Roberts, Edusei, and Wyche, who had advised her to the contrary. It also is inconsistent with plaintiff's own testimony that she felt neglected and mistreated by the staff. In light of the fact that plaintiff was placed on probationary status in December 1988, and plaintiff's own inconsistent testimony, the Court finds patently not credible plaintiff's testimony that no one communicated her deficiencies to her and that she believed she was doing well.
[11] Plaintiff's claim that she is entitled to the salary of an anesthesiologist for her years of unemployment is wholly unsupported by the evidence. See infra Part C.
[12] The Court notes that plaintiff alleges that she suffered severe depression for three years, which prevented her from working. It is unclear whether plaintiff is requesting damages for emotional distress. The Court notes that mental anguish is not a compensable injury in a contract action. See Asuncion v. Columbia Hosp. For Women, 514 A.2d 1187, 1190 (D.C.1986).
[13] Alternatively, the Court finds that the standard of care exercised by Howard in administering the performance evaluations  though not in strict compliance with the letter of the contracts  was reasonable, and, accordingly, the Hospital was not negligent.
[14] Dr. Wyche and Dr. Roberts both testified, and the Court finds credible, that it is extremely difficult to obtain a position without board certification. Dr. Wyche noted that, if one is not currently board-certified, it is expected that one eventually will become board-certified.
[15] In fact, Dr. Roberts testified that, based on her knowledge of plaintiff, at the time plaintiff was terminated she could not have become an uncertified anesthesiologist  only a nurse anesthetist  because she did not have the ability to make treatment decisions.