## IN THE SUPREME COURT OF MISSISSIPPI
## NO. 1998-CA-01007-SCT

*PHILLIP DEWAYNE KENNEDY*

*v.*

*METROPOLITAN LIFE INSURANCE COMPANY*

| | |
|---|---|
| DATE OF JUDGMENT: | 05/20/1997 |
| TRIAL JUDGE: | HON. TIMOTHY E. ERVIN |
| COURT FROM WHICH APPEALED: | PONTOTOC COUNTY CHANCERY COURT |
| ATTORNEY FOR APPELLANT: | JOHN A. FERRELL |
| ATTORNEYS FOR APPELLEE: | W. P. MITCHELL |
| | STEPHEN H. MORRIS |
| NATURE OF THE CASE: | CIVIL - CONTRACT |
| DISPOSITION: | AFFIRMED IN PART; REVERSED AND RENDERED IN PART - 03/16/2000 |
| MOTION FOR REHEARING FILED: | |
| MANDATE ISSUED: | 4/6/2000 |

# BEFORE PRATHER, C.J., SMITH AND WALLER, JJ.

# PRATHER, CHIEF JUSTICE, FOR THE COURT:

### STATEMENT OF THE CASE

¶1. Phillip Dewayne Kennedy ("Kennedy") worked as an insurance agent for Metropolitan Life Insurance Company ("Met Life") for over six years. In the process, Kennedy became one of the top life insurance salesmen in the Tupelo District. On August 4, 1995, Kennedy submitted his resignation to Shelby Ware ("Ware"), district manager of Met Life, and became associated with Massachusetts Mutual Insurance Company ("Mass Mutual").

¶2. Following Kennedy's departure, Ware initiated on behalf of Met Life an investigation into whether Kennedy had violated the non-competition terms of an employment contract that Kennedy had signed on January 27, 1989. Met Life concluded that Kennedy had in fact violated his non-competition agreement, and Met Life filed suit against Kennedy on September 20, 1995. Following trial, the Chancellor rejected Kennedy's argument that the non-competition agreement was contrary to public policy, and he further found that Kennedy had violated the terms of the agreement. The Chancellor awarded Met Life damages for lost premium income, as well as attorney's fees in enforcing the agreement. Feeling aggrieved, Kennedy timely appealed to this Court.

<u>**ISSUES**</u>

**I. Whether the trial court erred in finding that the non-competition portion of the Agreement was reasonable, was not violative of public policy and therefore enforceable and in finding that the Appellant violated said non-competition provisions.**

**II. Whether the trial court erred in finding that Appellee had suffered loss of premium income and counsel fees as a result of Appellant's alleged violation of the Agreement and in assessing damages therefor against Appellant.**

¶3. Kennedy argues on appeal that the Chancellor erred in upholding the non-competition agreement in the present case, or alternatively, that the Chancellor erred in finding that Kennedy had violated the provisions of the agreement. When considering the enforceability of restrictive employment agreements, we review the entire record and "the evidence which supports or reasonably tends to support the findings of fact made below, together with all reasonable inferences which may be drawn therefrom and which favor the lower court's findings of fact, must be accepted." *Sta-Home Health Agency, Inc. v. Umphers*, 562 So.2d 1258, 1263 (Miss.1990) (quoting *Culbreath v. Johnson*, 427 So.2d 705, 707 (Miss.1983)). We will not disturb the findings of the lower court when they are supported by substantial evidence unless the Chancellor has abused his discretion, was manifestly wrong, clearly erroneous or an erroneous legal standard was applied. *Bowers Window & Door Co. v. Dearman*, 549 So.2d 1309, 1312-13 (Miss.1989) (citing *Culbreath*, 427 So.2d at 707-08)). *Bullard v. Morris*, 547 So.2d 789, 791 (Miss.1989)).

¶4. Non-competition agreements have been viewed by this Court as "restrictive contracts [which] are in restraint of trade and individual freedom and are not favorites of the law." *Frierson v. Sheppard Building Supply, Co.*, 247 Miss. 157, 172, 154 So.2d 151, 156 (1963). *See also Texas Road Boring Co. v. Parker*, 194 So.2d 885, 888 (Miss.1967). Only when such agreements are reasonable will they be considered valid and upheld by this Court. *Frierson*, 247 Miss. at 172, 154 So.2d at 156. The validity and the enforceability of a non- competition agreement are largely predicated upon the reasonableness and specificity of its terms, primarily, the duration of the restriction and its geographic scope. *Empiregas, Inc. v. Bain*, 599 So.2d 971, 975 (Miss.1992); *Redd Pest Control Co. v. Heatherly*, 248 Miss. 34, 157 So.2d 133 (1963). The burden of proving the reasonableness of these terms is on the employer. *Texas Road Boring Co.*, 194 So.2d at 889.

¶5. The non-competition provision in the present case provided that:

1. During and for 18 months following my voluntary or involuntary termination of employment with Metropolitan, I will not directly or indirectly perform any act or make any statement which would tend to divert from Metropolitan any trade or business with any customer, be it a person, a company, or an organization, to whom I previously sold insurance offered by or through Metropolitan; nor will I advise or induce any customer of Metropolitan, be it a person, a company or an organization, to reduce, replace, lapse, surrender or cancel any insurance obtained from or through Metropolitan.

Kennedy argues that he did not violate the aforementioned provision, given that the evidence at trial established that all of his Met Life clients who switched to Mass Mutual had done so of their own volition and without advice or encouragement on his part. The record supports Kennedy's assertions in this regard.

¶6. Howard Carnes, who had been friends with Kennedy for eight years, testified that he learned that Kennedy was no longer a Met Life employee from talking to his wife. Carnes testified that, upon learning the news, he decided to drop his Met Life policy and obtain coverage with Mass Mutual "because I wanted (Kennedy) to be my agent." Carnes testified that Kennedy took no actions at all to influence his decision to switch his coverage to Mass Mutual, and that the decision was his alone. Carnes did acknowledge on cross-examination, however, that Kennedy had processed his application with Mass Mutual, including arranging a physical examination.

¶7. Kenneth Clowers, who is married to Kennedy's sister-in-law, testified that he had known Kennedy for approximately five years. Clowers testified that he learned of Kennedy's departure from Met Life at a "family get together" and that he decided to switch his coverage to Mass Mutual due to family loyalty and due to his satisfaction with Kennedy's service as an agent. Clowers testified that the decision to switch coverage was "totally" his own and that Kennedy had done nothing to influence that decision. In fact, Clowers testified that Kennedy had "actually tried to get me to keep the policy, but like I said, I don't have any loyalty to a company. I have a loyalty to a brother-in-law." Clowers acknowledged on cross examination that, once he decided to switch his coverage to Mass Mutual, Kennedy arranged for him to do so.

¶8. Brenda Matthews testified that she knew Kennedy through his status as her Met Life insurance agent for several years. Matthews testified that she learned of Kennedy's having left Met Life when she called Met Life to inquire about her coverage. The Met Life representatives informed Matthews that Kennedy no longer worked there, although they did not inform her where he was working. Matthews testified that she then called Kennedy's wife "because I knew them personally." Matthews testified that "they were acquaintances, but friends if need be" and that she felt she was close enough to Kennedy to call his wife. Matthews testified that "I decided if he wasn't there (at Met Life) I didn't want to be there because of the fact of who he was, and I could depend on him and call him and he would be there for me." Matthews further testified that "it was my request that he come to my house, and he did. And it was my request that he show me what he had, because I was not going to keep the insurance that I already had any way."

¶9. Joyce McGar provided very similar testimony, testifying that she had known Kennedy for 10 years and that she called him when she heard he was no longer employed at Met Life. McGar testified that Kennedy had done nothing to induce her to make this decision.

¶10. Kennedy also emphasizes that, at the time he quit his position, he had approximately 1,000 policyholders on the books at Met Life. Of these 1,000 policyholders, Met Life only presented evidence that twenty-one switched their coverage to Mass Mutual. Moreover, as noted *supra*, all policyholders who testified at trial indicated that it was their decision alone to switch their coverage to Mass Mutual and that Kennedy did not advise them to do so.

¶11. Met Life does not dispute that the aforementioned customers contacted Kennedy of their own volition, and Met Life instead argues that Kennedy violated the agreement by helping these customers to obtain Mass Mutual policies once they contacted him. Specifically, Met Life argues that:

> The non-competition provisions at issue prohibited Kennedy from "directly or indirectly perform(ing) any act or mak(ing) any statement which would tend to divert from Metropolitan any trade or business with any customer ... to whom (he had) previously sold insurance." Kennedy contends that he did not violate these prohibitions because he did not solicit the customers who changed their

policies to Mass Mutual; rather, he argues, since these customers contacted Kennedy and allegedly desired to continue to do business with him, he can not be found to have diverted Met Life's business. Nevertheless, Kennedy admitted that once contacted, he prepared premium quotations for the customers, prepared applications for coverage with Mass Mutual, prepared replacement coverage notices to MetLife, collected initial premiums and delivered their new Mass Mutual policies. The chancellor found that Kennedy's participation in the change of coverage as stated above constituted activities which "would tend to divert" business with such insurance clients and, therefore, violated the language of the non-competition agreement.

An analysis of the relevant case law reveals that courts have often enforced non-competition agreements which clearly prohibit an employee from practicing his trade at all within a given geographical area for a specified period. Met Life argues that the non-compete provision in the present case is less restrictive to Kennedy in that it does not forbid him from selling insurance at all, but merely limits his right to sell insurance to his former Met Life customers.

¶12. Met Life cites *James S. Kemper & Co. Southeast, Inc. v. Cox & Assocs., Inc.*, 434 So.2d 1380, 1383 (Ala. 1983), in which the covenant not to compete provided that the salesman would not "solicit, place, accept, or aid in the replacement or renewal, of any such insurance ... or otherwise participate in the writing of any insurance [from former customer]." In interpreting and enforcing this provision, the Alabama Supreme Court held that "restrictions in the covenant reasonably relate to the protection of Kemper's interests in a narrow, identifiable group of clients and potential clients, where Kemper had a work product investment in those clients." *Kemper*, 434 So.2d at 1384. The Alabama court accordingly held that the agreement did not violate public policy.

¶13. Met Life also cites *Girard v. Rebsamen Ins. Co.*, 685 S.W.2d 526 (Ark. Ct. App. 1985), in which an Arkansas appellate court enforced a non-compete provision which provided that a former employee could not "solicit or accept, or assist in the solicitation or acceptance of, any insurance business from any account which (the employee) was servicing at the time of such termination." *Girard*, 685 S.W.2d at 526. In upholding the provision, the Arkansas court noted that the provision was less restrictive than traditional non-compete provisions:

> Under the parties' agreement, appellant is not forced to go elsewhere to open his agency. Since no geographical restriction is mentioned, he can continue his business in the same city in which he lived while employed with appellee. Appellant is free to solicit and accept business from 95% of the overall insurance market, and, in fact, is free to solicit and accept business from 80% of the customers of appellee's Springdale office. Appellant's only restriction involves that portion of appellee's business that he serviced when he quit appellee.

*Id.* at 529.

¶14. This Court agrees with Met Life that a non-compete provision which prohibits an ex-employee from accepting business with his former customers may, in appropriate cases, constitute a reasonable and enforceable non-compete provision. However, this Court concludes that the non-competition provision in the present case is ambiguous in that, unlike the provisions in *Kemper* and *Girard*, the provision in the present case does not expressly prohibit Kennedy from "accepting" business with a former employee. Instead, as noted *supra*, the provision in the present case rather ambiguously provides that:

1. During and for 18 months following my voluntary or involuntary termination of employment with Metropolitan, I will not directly or indirectly perform any act or make any statement which would tend to divert from Metropolitan any trade or business with any customer, be it a person, a company, or an organization, to whom I previously sold insurance offered by or through Metropolitan; nor will I advise or induce any customer of Metropolitan, be it a person, a company or an organization, to reduce, replace, lapse, surrender or cancel any insurance obtained from or through Metropolitan.

In the view of this Court, the language of this particular non-compete provision is subject to differing interpretations. One arguable interpretation of the provision is that it prohibits the selling of any insurance by Kennedy to his former customers, even if the customer decided to change his coverage on his own volition. Another reasonable interpretation of the provision, however, is that the provision merely prohibits Kennedy from inducing or advising his former customers to change their coverage to Mass Mutual.

¶15. The agreement ambiguously prohibits Kennedy from "perform(ing) any act or make any statement which would tend to divert from Met Life any trade or business with any customer." Given these ambiguities, it is apparent that Kennedy was placed in a very uncertain position when he was contacted by his former customers who were seeking to switch their coverage. Kennedy could have reasonably concluded that, since these former customers had already decided to switch their coverage, and had initiated contact with him, he would not be violating the provisions of the non-compete agreement by accepting their business.

¶16. This Court also notes that there is no evidence in the record that Kennedy encouraged a single policy holder to switch coverage from Met Life to Mass Mutual.[1] The record supports a conclusion that Kennedy was attempting to comply with the requirements of the non-compete provision, as he understood the requirements to be. Moreover, as noted earlier, Kennedy had issued over one thousand active policies at the time of his departure from Met Life, and Met Life only sought damages for twenty-one of these policies. While neither of these factors is, by any means, dispositive, this Court concludes that an enforcement of the non-compete agreement against Kennedy would be particularly unfair under the facts of the present case.

¶17. Given the unfavored status of non-competition agreements in the eyes of the law, the burden properly falls on the employer to draft a non-competition agreement which clearly delineates the scope of the employee's permissible business activities following the termination of employment. In the present case, Met Life failed to draft such an agreement, and this Court concludes that Met Life, rather than Kennedy, should bear the burdens of the agreement's ambiguities. The trial court judgment in favor of Met Life is accordingly reversed, and judgment is rendered in favor of Kennedy with regard to Met Life's action against him.

> **III. Whether the trial court erred in failing to find that appellee was guilty of tortious interference with Appellant's business endeavors, defamed Appellant by both words and deeds and intentionally inflicted emotional distress on Appellant through the conduct of Shelby Ware, the representative of Appellee.**

¶18. Kennedy filed a counterclaim against Met Life arguing that he was entitled to a judgment against Met Life for defamation, intentional infliction of emotional distress, and/or tortious interference with business relations. After considering Kennedy's evidence and arguments in this regard, the trial judge found in favor of Met Life with regard to all of these causes of action. On appeal, Kennedy argues that the trial judge's rulings in this regard are erroneous and that this Court should reverse the ruling of the trial court and render

judgment in his favor. However, Kennedy does not even list, much less discuss, the elements of the causes of action for which he seeks judgment to be rendered, and his entire argument in this regard is without citation to authority.

¶19. Met Life does in fact discuss the elements of these causes of action in its brief, and it argues that the trial judge correctly found that Kennedy failed to establish a right to recover on any of the aforementioned theories of recovery. In his reply brief, Kennedy fails to respond to Met Life's arguments at all. Kennedy clearly faces a difficult burden in seeking for this Court to reverse and render judgment in his favor, and it is apparent that Kennedy's arguments are inadequate as a matter of law in this regard. This point of error is without merit, and the trial court's judgment is affirmed with regard to these causes of action.

¶20. For these reasons, the judgment of the Pontotoc County Chancery Court is affirmed to the extent that it rejected Kennedy's counterclaim against Met Life, but to the extent that it awarded Met Life damages and attorney's fees against Kennedy, judgment is reversed and rendered here dismissing Met Life's complaint and this action against Kennedy with prejudice.

¶21. **AFFIRMED IN PART AND REVERSED AND RENDERED IN PART.**

**PITTMAN AND BANKS, P.JJ., McRAE, SMITH, MILLS, WALLER AND COBB, JJ., CONCUR.**

1. As noted *supra*, Kenneth Clowers testified that Kennedy tried to talk him out of switching his coverage to Mass Mutual.