FCE BENEFIT ADMINISTRATORS, INC., Plaintiff,

v.

GEORGE WASHINGTON UNIVERSITY, et al. Defendants.

No. CIV.A. 00–0682(ESH).

United States District Court, District of Columbia.

June 11, 2002.

David U. Fierst, Stein, Mitchell & Mezines, Washington, DC, Robert D. Eassa, Filice Brown Eassa & McLeod LLP, Oakland, CA, for Plaintiff.

Michael Allen Dymersky, Furey, Doolan & Abell, L.L.P., Chevy Chase, MD, Christopher E. Hassell, Bonner, Kiernan, Trebach & Crociata, Washington, DC, William Halladay White, Jr., Bonner, Kiernan, Trebach & Crociata, Washington, DC, James Russell Schraf, Michael Tilmon O'Bryant, Lipshultz & Hone, Chartered, Silver Spring, MD, for Defendants.

### *MEMORANDUM OPINION*

HUVELLE, District Judge.

This is a breach of contract action brought by FCE Benefit Administrators, Inc. ("FCE") against Patterson/Smith Associates ("PSA").[1] FCE is a California

---

1. Of seven original defendants, only PSA remains. Plaintiff's breach of contract claim is the sole remaining count.

corporation that designs and administers health insurance benefit plans, including plans for employers with government contracts. PSA is an insurance agent licensed in Virginia to sell, *inter alia*, health insurance and employee benefits coverage. Plaintiff alleges that defendant breached the Agent Fee Agreement, which prohibited PSA from diverting, soliciting or disclosing information about any of FCE's existing customers. FCE seeks damages, plus injunctive and declaratory relief.

The case was bifurcated for trial, and the issue of liability was tried before this Court on March 18–19 and April 8, 2002. The witnesses at trial were: 1) Steve Porter, the executive vice president of FCE; 2) Renie Fellers, the benefits manager for Melwood Horticultural Training Center ("Melwood"); 3) Diane Lapin, the director of managed care for FCE; 4) Holly Miller, a senior vice president of PSA; 5) Eileen Wilson, the former vice president of sales, customer service, and product development with the George Washington University Health Plan ("GWUHP"); and 6) Gary Beckman, the president and chief executive officer of FCE. Based on the testimony and the sixty exhibits admitted at trial, the Proposed Findings of Fact and Conclusions of Law submitted by the parties, and the applicable case law, the Court makes the following Findings of Fact and Conclusions of Law.

## FINDINGS OF FACT

### I. The Relationship Between FCE and PSA

1. On April 9, 1992, PSA and FCE [2] entered into an Agent Fee Agreement (the "Agreement"). This Agreement, which was signed by Porter and Daniel Frakes, who was the vice president of group health at PSA (Beckman Test. at 25:23–25), authorized PSA to be FCE's "Agent" and to represent FCE to eligible firms for participation in FCE-administered plans. Paragraph 5 of the Agreement provides:

> Agent promises and agrees not to engage in any unfair competition with FCE. Agents shall not divert or attempt to divert any of FCE's business either to itself or to any other person, firm or company. Agent shall not either directly or indirectly (a) make known to any person, firm, or corporation the names or addresses of any of FCE's customers or potential customers, or any other information pertaining to them; [or] (b) call on, solicit, take away, or attempt to call on, solicit, or take away any of FCE's customers either on its behalf or that of any other person, firm, or corporation either during the term of this Agreement and for a period of two years after the termination of this Agreement
> . . . .

(Pl.Ex. 1, ¶ 5.)

2. Paragraph 4 of the Agreement originally provided that the "Agent hereby agrees not to sell or act as agent for any other health and welfare benefit plan, which is a direct competitor of FCE so long as this Agreement is in effect." (Pl. Ex. 1, ¶ 4.)

3. The Agreement was amended by a letter from Beckman to Frakes dated September 4, 1994, "to delete the condition preventing P/SA from representing other Service Contract Industry and/or Davis Bacon Industry benefit providers." [3] (Pl. Ex. 2.) The Agent Agreement as amended is still in effect. However, Frakes left FCE after the Agreement was amended, and Steve Smith has been the head of

---

**2.** The Agreement was actually entered into by Federal Contract Employees Health and Welfare Fund, Inc., which was a predecessor of FCE.

**3.** These statutes regulate benefits for federal government contract employees.

PSA's employee benefits division since October 1998. (Trial Trans. at Vol. 2, 80:3–12.)

## II. The Relationship Between FCE and Melwood

4. On January 14, 1997, FCE entered into a trust agreement (the "Trust Agreement") for the health and welfare plan of Melwood (the "Plan"), a nonprofit corporation that employs developmentally disabled and mentally challenged individuals as federal contract workers. (Pl.Ex. 4.) Melwood has two distinct categories of employees who are served by two different health care plans. The staff of Melwood are members of one plan, which is not at issue in this case. The federal contract employees at Melwood are members of a second plan, and the terms of their employment are regulated by the Service Contract Act, 41 U.S.C. § 351, *et seq.* FCE administered the health plan of these contract employees beginning in 1997.

### A. Fellers Arrives at Melwood

5. Fellers became the benefits manager at Melwood on March 16, 1998. (Fellers Test. at 115:10–11.) Prior to working at Melwood, Fellers was a group benefits broker for six years with Benecor Associates ("Benecor"), an organization that was "very similar" to PSA. (Fellers Test. at 184:3–5.)

6. In her time at Benecor, Fellers brokered a number of health care plans for organizations with developmentally disabled employees. For this particular type of population, it was her experience that a Health Maintenance Organization ("HMO") "would be a very popular choice from the standpoint of plan design and cost." (Fellers Test. at 184:11–16.)

7. In the spring of 1998, shortly after beginning work at Melwood, Fellers contacted Miller in connection with the staff benefits plan.[4] (Fellers Test. at 123:24–124:4.) Miller, who had been recommended to Fellers by another official at Melwood, provided quotes for alternative staff health insurance plans. (Miller Test. at 5:20–6:13.) Although Melwood ultimately decided to remain with its existing staff plan, it did hire PSA as the broker for that plan. (Miller Test. at 8:19–21.)

8. In July 1998, the FCE Plan was amended at Melwood's request. The new Plan was the FCE Preferred Provider Organization ("PPO"), which reduced the number of hospitals available to Plan members to two from between six and eight. (Lapin Test. at 195:24–196:4; 207:11–208:14.)

9. Fellers did not recall that more than two hospitals were available before the switch (Fellers Test. at 119:12–16), and testified that "[t]he most significant unresolved dissatisfaction [with the FCE Plan] was that the Plan allowed only for one hospital and one children's hospital for non-emergency care." (Fellers Test. at 120:16–19.)

### B. Melwood Expresses Concerns with the FCE Plan

10. On July 27, 1998, Fellers sent a letter to Beckman regarding "Major Medical Issues," in which she raised a number of concerns or "issues" surrounding FCE's administration of the Plan. (Pl.Ex. 16 at 1, 5.) Although these issues were primarily administrative, Fellers also asked questions about coverage for Melwood employees who worked less than 30 hours per week, and sought clarification on deductibles. (*Id.* at 4–5.) The letter noted, "I hope that these issues are received in the manner I intend—not as complaints," and concluded, "I'm committed to making this

---

**4.** This plan was not then, and has never been, administered by FCE.

plan work smoothly and need you and your staff's help to make that happen." (*Id.* at 1, 5.)

11. Beckman responded to Fellers by phone immediately after he received her letter, and memorialized their conversation in a July 31 letter to Fellers. He did not hear back from her again about those particular issues. (Pl.Ex. 15; Beckman Test. at 29:25–30:21.)

12. In late August 1998, Fellers, Frank Herron,[5] and other Melwood officials met with representatives of FCE, including Beckman and Lapin, to discuss additional issues that Fellers had not raised in her July letter. (Fellers Test. at 141:7–14.) In particular, the Melwood representatives explained that they were concerned about delays that their contract employees were experiencing in receiving their Plan identification cards and prescription drug benefits. (*Id.*)

13. According to Beckman, the delays in the processing of ID cards were not FCE's fault, but were attributable to FCE's difficulty in receiving timely information from Melwood about its employees. (Beckman Test. at 32:15–17.) Nonetheless, in order to address Melwood's concerns, FCE set up a "fast fax" system so that Melwood could send information to FCE about its employees as soon as they began work. (Beckman Test. at 33:5–8; Porter Test. at 89:22–90:1.) FCE also implemented an 800 number so that the health care providers of Melwood contract employees who did not have an ID card at the time they sought treatment could call and confirm coverage. (Beckman Test. at 34:3–15.)

14. The problems in the timely provision of prescription drug services occurred after FCE switched to a new provider, EBRX. As Beckman testified, against the advice of FCE, "Melwood insisted on being the very first client to go through the shake-out period with EBRX. And without any surprises there were some shake-out issues, as we anticipated." (Beckman Test. at 35:1–36:2.)

15. Whether her frustrations were justified, Fellers continued to express dissatisfaction with the FCE plan, and in particular with FCE's handling of ID cards and prescription drugs. On October 6, 1998, Jeff Ramsey, who was the broker for the Melwood account,[6] wrote to Beckman to convey Fellers' feeling that "things have not improved," and that "[t]hese problems have caused considerable frustration on Melwood's part and Melwood is approaching the saturation point." Ramsey detailed the problems, many of which had been discussed at the August meeting, and warned Beckman to "develop a 'red alert' plan of action and get back to me quickly with a permanent resolution for these problems." This letter was cc'd to Melwood employees Herron, Fellers, and Betsy Bruno, and to FCE's Porter. (Def.Ex. 3.)

## C. Melwood Explores Alternative Health Care Plans

16. In August 1998, Fellers contacted Miller regarding health insurance for Melwood's contract employees. This was the

---

5. Herron was the CEO of Melwood.

6. In the early 1990s, Ramsey worked as a broker for PSA, and was in fact responsible for introducing Beckman to Frakes, which led to the business relationship between FCE and PSA. Ramsey subsequently left PSA to form his own company, and it was in this independent capacity that he acted as the field administrator for Melwood with respect to the FCE plan. At all times relevant to this action, Ramsey was not an employee of either FCE nor PSA; with regard to his Melwood account, he worked directly for Melwood and received an annual commission of $93,000. (*See* Beckman Test. at 24:13–28:2; 96:24–27.)

first discussion between the two individuals—or between any representatives of Melwood and PSA—regarding the contract employees' health plan. (Fellers Test. at 145:16–146:11.) At all relevant times, Miller was unaware of the contract between FCE and PSA, and she had not been told to refrain from selling alternative plans to existing FCE customers.[7] (Miller Test. at 35:6–36:23.)

17. On September 18, 1998, Fellers gave Miller a census of Melwood contract employees,[8] and asked her "to look at plans for [the] contract worker employees. . . . Basically, we gave her the plan that we currently had and asked her to go out and look at the marketplace, see what was there." (Fellers Test. at 147:4–5; 157:1–3.)

18. In making this request, Fellers told Miller that she was "primarily interested in HMO plans." (*Id.* at 157:3–4.) Miller understood that she was to look only at HMOs in her analysis. (Miller Test. at 69:4–70:24.)

19. In acquiring the information that Fellers requested, Miller disclosed to several other companies that Melwood was one of FCE's existing customers, as well as the terms of Melwood's existing FCE benefits plan and the census of Melwood employees. (Miller Test. at 48:19–50:4.)

20. Miller solicited quotes only for HMO plans, including GWUHP, Blue Cross/Blue Shield, Optimum Choice, and Prudential. (Pl.Exs.7–13.) Miller "saw nothing wrong with disclosing information about Melwood to other potential suppliers [or soliciting] other alternatives" for Melwood. (Miller Test. at 44:6–9.)

21. During the fall of 1998, Miller prepared a spreadsheet comparing the FCE plan with the alternatives she had solicited. (Miller Test. at 15:1–23.) In November, she provided that information to Melwood's benefits committee, which was composed of Fellers, Herron, and several other individuals, and which had been formed to explore other health plan options. (Miller Test. at 16:1–17:2; Fellers Test. at 156:2–5.) Miller met in person with the committee on three or four occasions, and spoke by phone with Fellers many times about the alternatives. (Miller Test. at 18:9–14; Def. Ex. 1, ¶6.) Miller was involved in discussions with Melwood about whether to change plans, and worked hard on providing Melwood with alternative proposals. (Miller Test. at 45:7–25; 67:22–24.)

22. The spreadsheets that Miller prepared did not accurately compare FCE's plan with those of its competitors in several respects. First, the benefits under the FCE plan were based on the existing hourly rate of $1.16 per employee, while those under the competitors' plans were calculated using a rate of $1.39, which was to take effect the following year.[9] (Porter Test. at 59:6–22; Pl. Exs. 8–13.) As a result, the competitors' plans contained $.23 per hour more benefits per employee than did FCE's.

---

7. In fact, Miller did not learn of the existence of the contract until after this lawsuit was initiated. (Miller Test. at 35:6–9.)

8. The census included the name, address, gender, and dependent status of each current Melwood contract employee. (Miller Test. at 11:21–25.)

9. The Department of Labor sets this rate, known as the "fringe rate," which is the amount that an employer must contribute for health care for each hour worked by a federal contract employee. The fringe rate is paid by the government through the employer, and is the precise amount that the employer is allocated for health care. The employer may, however, choose the type of health plan that it wishes to provide for its contract employees. (Porter Test. at 62:6–25.)

23. Second, the comparison did not show that FCE also included dental insurance, vision care, life, accident and dismemberment, and supplemental accident benefits in its plan at the fringe rate, and that its competitors did not. (Porter Test. at 63:12–64:1.)

24. Third, the comparison omitted the fact that FCE's plan provided out-of-network benefits for those employees who chose to see physicians other than those specifically covered by the plan, while its competitors' plans did not. (*Id.* at 64:2–15.)

25. Fourth, the spreadsheets did not indicate that FCE provided "eligibility administration" in conjunction with its plan, thus ensuring that the health care benefits were in compliance with the Service Contract Act, while its competitors did not. (*Id.* at 64:16–68:23.)

26. The GWUHP bid was also based on erroneous data regarding the ages of a number of Melwood employees. The correct census revealed "a significant increase" in Melwood workers over the age of 50, and a "significant reduction" in employees under the age of 30. (Pl.Ex. 23.) Were it not for these errors, the rates that Miller had obtained for this plan would have increased by approximately $8 per employee per month. (Pl.Ex. 26.)

### D. Melwood Changes Plans

27. On November 12, 1998, Herron sent a letter to FCE indicating Melwood's reluctance to renew its contract because of "numerous administration issues during the past year." (Def.Ex. 9.)

28. In early January 1999, the Melwood benefits committee made its final decision to terminate the plan with FCE effective April 1, 1999.[10] (Fellers Test. at

156:9–10.) Melwood communicated this decision to FCE in a letter from Herron to Beckman dated January 29, 1999. (Pl.Ex. 20.)

29. On February 1, 1999, Ramsey wrote a lengthy letter to Melwood elaborating on a number of reasons why he felt it would be better for Melwood to remain with FCE than to switch to an HMO. (Def. Ex. 5.)

30. On February 10, 1999, Herron faxed to Porter a "rationale for switching to [an] HMO plan." (Def. Ex. 6, at 1.) Melwood listed eight reasons for leaving FCE, including "service issues," "expanded provider network," and "won't need an hour bank," and noted five additional factors that led to the choice of GWUHP, including "have brokerage support from Patterson Smith." (*Id.* at 2.) In his fax, Herron noted that terminating the FCE Plan "was a tough decision." (*Id.* at 1.)

31. Following a series of telephone calls, in early March 1999, Lapin and Porter met with Fellers and Herron in a final attempt to convince Melwood to retain the FCE Plan, or at least to try to understand why Melwood had made the decision to switch. (Lapin Test. at 218:7–219:11; Porter Test. at 98:18–99:7.) At the meeting, the FCE attendees explained the inaccuracies in the comparisons that had been provided to Melwood, but according to Porter, the Melwood people "didn't seem concerned about it." (Porter Test. at 68:25–69:22.) FCE even offered to structure an HMO-style plan for Melwood. (Lapin Test. at 220:12–13.) Melwood rejected FCE's proposals at what Lapin described as "a courtesy visit." (Lapin Test. at 220:9–18; 231:7.)

---

10. Of FCE's 65 clients comparable to Melwood, only three others have ever terminated their contracts with FCE, and all three later reinstated those agreements. (Porter Test. at 55:8–16.)

32. On March 26, 1999, Porter sent a final letter to Melwood. In the letter, he noted that he had "asked Frank [Herron] the reason Melwood decided to change plans, and he responded by saying the service was poor." (Def.Ex. 7.)

33. Melwood's contract with GWUHP took effect on April 1, 1999, and Melwood was a client of that plan until GWUHP ceased doing business on January 1, 2002. Melwood was consistently satisfied with GWUHP. (Fellers Test. at 162:8–10; 164:11–22.) PSA earned a $35,000 commission for the first year of the contract between Melwood and GWUHP, and the commission increased by 2.5 percent the following year. (Miller Test. at 20:23–21:10; 47:3–18.)

## CONCLUSIONS OF LAW

The parties are in agreement that there are two issues before the Court: (1) did PSA breach the Agreement, and if so, (2) did the breach cause Melwood to terminate its contract with FCE. For the reasons explained below, the Court concludes that there was a technical breach of ¶ 5 of the Agreement by virtue of Holly Miller's activities, but that plaintiff has not sustained its burden to show that the breach was the proximate cause of Melwood's decision to switch plans. Rather, the evidence shows that Melwood was dissatisfied with FCE, and wanted to provide its employees with an HMO plan, as opposed to a PPO plan.

## I. Breach of Contract

1. To defeat the breach of contract claim, defendant argues (1) that the September 20, 1994 amendment to the contract amended both ¶¶ 4 and 5 of the Agreement, and (2) that Holly Miller's conduct did not constitute a breach, since Melwood initiated contact with PSA and Miller's activities did not violate the terms of the Agreement. Neither argument is persuasive in the face of the unrebutted testimony regarding the 1994 amendment and the extent of Miller's activities.

2. According to the undisputed testimony of Beckman and Porter, the September 20 amendment was intended only to eliminate the exclusivity of the agent relationship set forth in ¶ 4 of the Agreement, but was to have no effect on the prohibitions in ¶ 5 of the Agreement. (Porter Test. at 43:17–44:3; Beckman Test. at 18:8–20:21.) The motivation for this change was FCE's desire to reduce PSA's commission rate, and in return, PSA wanted to eliminate the contract's exclusivity requirement. (Porter Test. at 38:17–39:3; Beckman Test. at 18:15–20:3.) This extrinsic evidence stands unrebutted, and thus, the Court finds that ¶ 5 of the Agreement remained in effect at all relevant times.

3. In addition, Miller's activities breached ¶ 5 of the Agreement in two respects. First, it is undisputed that Miller provided information regarding Melwood, one of FCE's existing customers, to other companies, in violation of ¶ 5(a). Second, Miller violated ¶ 5 by attempting to solicit and divert FCE's business. Contrary to defendant's argument, Miller did not merely play a passive role. Even though she was initially contacted by Melwood and asked to provide rates for HMO plans, she assumed an active role in Melwood's decision-making process. By her own admission, she solicited alternative price quotes, she met repeatedly with Melwood's benefits committee, and she prepared numerous spreadsheets, including comparisons of the current FCE plan with the GWUHP and an analysis of FCE's costs to Melwood. (Pl. Exs. 7–14, 17; Miller Test. at 54:10–55–16; 192:21–193:7.) Furthermore, she admitted that she was involved in discussions over whether to change plans, and provided information about alternatives to help Melwood to decide whether to make a

change, and that her intent in performing these actions was to sell a health benefit insurance plan other than the FCE plan to Melwood. (Miller Test. at 45:4–6; 52:21–53:3; 67:13–21.) Finally, Miller had an obvious financial motive for these efforts, since she realized a commission (i.e., 25% of the commission paid by Melwood to PSA) from Melwood's decision to terminate FCE. (Miller Test. at 46:10–22.)

4. Although Miller was admittedly unaware of the Agreement between PSA and FCE, her activities constituted far more than merely "accepting Melwood's business," as argued by defendant. (Def. Proposed Findings of Fact and Conclusions of Law at 26–28.) Rather, she engaged in "affirmative action," *Akron Pest Control v. Radar Exterminating Co., Inc.*, 216 Ga. App. 495, 455 S.E.2d 601, 603 (1995), and thus, her actions are distinguishable from the facts underlying the cases cited by defendant. *See, e.g., id.; Kennedy v. Met. Life Ins. Co.*, 759 So.2d 362 (Miss.2000); *J.K.R., Inc. v. Triple Check Tax Service, Inc.*, 736 So.2d 43 (Fla.App.1999).

## II. Proximate Cause

■ 5. Having found a breach, the Court turns to the issue of proximate cause. The parties agree that plaintiff bears the burden of proving that but for defendant's breach, FCE would have retained Melwood as a client. (Trial Trans., Vol. I, at 9:24–10:2; 15:3–5.) *See Executive Sandwich Shoppe Inc. v. Carr Realty Corp.*, 749 A.2d 724, 736–37 (D.C.2000) ("Under a breach of contract, a defendant is liable for such damages as are the natural consequence and proximate result of his conduct.") (citing *Murphy v. O'Donnell*, 63 A.2d 340, 342 (D.C.1948)); Restatement (Second) of Contracts, § 346, comment b ("Although a breach ... always gives rise to a claim for damages,

there are instances in which the breach causes no loss.").

6. In an attempt to sustain its burden, plaintiff puts forth a series of arguments in support of its claim that but for Miller's efforts, Melwood would not have terminated FCE. Plaintiff contends that: (1) defendant has "grossly overstat[ed] the degree of [Fellers'] dissatisfaction with FCE" (Pl. Reply at 7); (2) Miller's inaccurate information, especially regarding the comparative costs of the various plans and FCE's fees, led to a decision that would be economically indefensible if the correct information had been presented (Pl. Proposed Findings of Fact and Conclusions of Law at 13–16; Pl. Reply at 2, 9–10); (3) Fellers was not a credible witness, especially with respect to her desire to switch to an HMO and her criticisms of FCE's plan and its services (Pl. Proposed Findings of Fact and Conclusions of Law at 22–24; Pl. Reply at 3, 6–8, 13); and (4) Herron, the ultimate decision-maker, who referred to the termination as a "tough decision," would not have canceled the contract with FCE absent Miller's efforts. (Pl. Proposed Findings of Fact and Conclusions of Law at 22; Pl. Reply at 3, 12, 14.) While plaintiff correctly argues that some of the information provided to Melwood was inaccurate[11] and that Fellers' testimony was inaccurate regarding the number of hospitals that had been available under FCE's plan prior to July 1998 (*see* Fellers Test. at 119:12–19), the Court is nonetheless unconvinced by plaintiff's arguments, since they are controverted in many instances by the testimony and the exhibits, they are premised on speculation, especially with respect to Herron's thought processes, and they are inconsistent with the Court's assessment of Ms. Fellers, whose testimony the

---

11. The inaccurate information included a mischaracterization of the FCE fees and bene- fits as compared with an HMO, and the statement that FCE used an hour bank.

Court finds to be credible and substantiated by the testimony of others.

7. Contrary to plaintiff's arguments, which are discussed more fully below, the Court finds that it was not FCE's breach that caused the loss of Melwood,[12] but rather, it was Melwood's dissatisfaction with FCE's plan and its services, as well as Ms. Fellers' sincere belief that an HMO, as opposed to a PPO plan, would be more beneficial to the Melwood employees because of its simplicity and flexibility.

8. With respect to the issue of Melwood's dissatisfaction with FCE,[13] the contemporaneous documents, as well as the testimony, demonstrate that defendant has not overstated the problem. Melwood experienced a series of problems with FCE's plan, which it communicated to FCE through the summer and fall of 1998. Fellers' July 27 letter to Beckman (Pl.Ex. 16),[14] the August meeting between the two companies, Ramsey's October 6 letter to Beckman (Def.Ex. 3), Herron's November 12 letter to Beckman (Def.Ex. 9),[15] and the testimony of Fellers—who was the only Melwood witness to testify about Melwood's unhappiness with FCE—paint a compelling picture of Melwood's unhappiness with FCE, and dispel any argument that Melwood's concerns were "non-issues," as Lapin tried to suggest. (Lapin Test. at 219:21.) In fact, Herron cited "numerous administration issues" in his November 1998 letter as the reason for his reluctance to renew the contract (Def.Ex. 9); these service-related issues were listed as the first item in Herron's February 10, 1999 fax to Porter, in which he explained his many reasons for terminating the contract (Def.Ex. 6); and Herron told Porter in March 1999 that the reason for the termination was that "service was poor." (Def.Ex. 7.)

9. Moreover, while it may be true that some of the problems regarding ID cards and prescription benefits were attributable to Melwood, and while FCE did institute

---

12. Obviously, any breach of ¶ 5(a) regarding the disclosure of information regarding Melwood did not contribute to Melwood's decision to switch plans, so the Court's inquiry relates solely to whether Miller's other actions caused Melwood's decision to terminate.

13. Plaintiff appears to argue that had Miller not interfered, Melwood would have worked with FCE to resolve the problems and it would have contacted FCE to reconfigure its plan. There is, however, no support for this. First, there is ample evidence that Melwood discussed its concerns and complaints with FCE on more than one occasion, but that many of the issues continued and the frustration increased during the fall of 1998. (*See, e.g.*, Def. Exs. 3, 9.) Second, plaintiff's representative believed that an HMO would be inappropriate for Melwood employees (Lapin Test. at 213:19–214:23), and FCE has rarely provided an HMO plan to any of its clients. (Beckman Test. at 48:24–51:12.) It is thus unlikely that Melwood would have turned to FCE for an HMO. Moreover, when Fellers raised the issue of offering a wider variety of hospitals for Melwood employees, Lapin responded: "that's the way the plan was set up." (Fellers Test. at 121:12–20.)

14. Plaintiff cites to this letter to support its argument that prior to Miller's involvement, Fellers did not have "complaints," only issues, and that she was "committed to making this plan work smoothly." (Pl.Ex. 16.) While Fellers did use those words, plaintiff has inaccurately parsed the letter in an attempt to discredit Fellers. When read as a whole, this letter provides little help to plaintiff's position, for it reflects a level of frustration with the services being provided and a surprisingly lengthy recitation of problems which Fellers apparently felt compelled to memorialize in a letter that was distributed to nine people in addition to Beckman.

15. Even Porter conceded that he understood from Herron's letter that he had an "unhappy client." (Porter Test. at 91:12–25.) In fact, as a result of this letter, FCE felt compelled to respond with a Performance Standard Proposal that would place FCE's fees at risk in the event that FCE did not perform satisfactorily. (Def.Ex. 4.)

reforms to address these issues, at the end of the day, Melwood did not see itself as the source of the problems, but remained dissatisfied with the nature of FCE's plan, its administration of the plan, and the level of service provided by its field representative, Jeff Ramsey. (Fellers Test. at 178:20–178:22.)

10. With respect to plaintiff's argument that Miller's intervention was instrumental because she provided inaccurate information regarding FCE's benefits and fees, the Court concludes that even if these mistakes had not been made, Melwood would have switched plans. While it is true that one could argue that FCE's plan may have had some economic advantages to Melwood over that provided by an HMO, it is also clear that Melwood's decision was not motivated by economic concerns. As explained by Fellers, and corroborated by Miller, Fellers felt strongly that an HMO was the best plan for Melwood's employees because an HMO was more readily understandable, and the employees would not have to worry about deductibles, co-insurance and out-of-pocket expenses. (Fellers Test. at 152:4–153:19; Miller Test. at 68:20–69:21.)

11. Fellers was familiar with HMO plans from her prior employment (Fellers Test. at 172:21–173:1), and she was the motivating force behind the decision to switch. In fact, even prior to contacting Miller, Fellers presented her idea to her supervisor, Jerry Wirth, and probably to Herron. (Fellers Test. at 172:5–174:2.) As a result of her predisposition, Fellers had Miller look only at the possibility of switching to an HMO plan. (Miller Test. at 69:4–7; 70:22–24; Fellers Test. at 147:4–5; 157:1–4.)

12. The strong desire to switch to an HMO for non-economic reasons was further corroborated by the testimony of Eileen Wilson, who served as vice-president of sales, customer service and research for

product development at GWUHP from September 1998 through March 2000. (Wilson Test. at 83:1–10.) Despite Wilson's reservations about having Melwood serviced by the GWUHP plan, Wilson went ahead because Fellers and Herron "wanted our health plan," because "it had a larger number of doctors in the network, and that they had employees who, while the company was in Maryland, the employees lived in many different locations, and it would allow them to have a broader selection or perhaps retain a doctor that they already had before they came to work there." (Wilson Test. at 97:11–98:6.)

13. Moreover, even though GWUHP raised its rates after the first year of its contract with Melwood to the level that they would have been had Miller provided it with an accurate census, the agreement with GWUHP was renewed at the higher prices for the next two years, and Melwood found the plan to be beneficial to its employees. (Fellers Test. at 164:16–22; Wilson Test. at 105:16–106:3.)

14. While FCE may be correct in arguing that its plan was better economically for Melwood, the issue is not whether Melwood made a wise economic decision in switching plans, but whether PSA's breach caused the termination. As is clear, Fellers was determined to change to an HMO and this desire would have outweighed the inaccuracies in Miller's presentation.

15. As was clear from the evidence, Fellers was committed to making the switch to an HMO given her past experience with developmentally disabled employees, and even prior to contacting Miller, she began her campaign of selling her idea to management. (Fellers Test. at 172:5–173:23.) And, although her July 27 letter paid lip service to the idea of continuing with FCE, that letter is more properly read as being consistent with her

goal of switching to an HMO. (*See* Pl.Ex. 16.)

16. In addition to attempting unsuccessfully to discredit Fellers' testimony, plaintiff tries to argue that her testimony is not that important since it was Herron who made the ultimate decision to terminate the contract, and he referred to it as "a tough decision." (Def. Ex. 6, at 1.) Plaintiff uses this phrase to argue that the choice was a close call, and therefore, it is likely that absent Miller's involvement, the decision would have gone the other way. (Pl. Proposed Findings of Fact and Conclusions of Law at 22; Pl. Reply at 3–4, 14.) However, there is no evidence that Herron considered it to be a close call, and there is no basis for plaintiff's claim that Herron "had no inclination to change until after Miller began interfering." On the contrary, the evidence introduced regarding Herron flatly contradicts plaintiff's statement that "[t]here is no evidence that he was dissatisfied with the FCE plan." (Pl. Reply at 3–4.) Herron met with FCE representatives in August to discuss problems, and he complained about FCE's performance in the November 12, 1998 letter in which he threatened termination. (Def.Ex. 9.) It is also significant that this letter was written over a month before Miller met with the benefits committee. (Miller Test. at 18:5–8.) Thereafter, Herron sent a fax to Porter on February 10, 1997, listing a host of reasons for his decision to terminate Melwood, including dissatisfaction with Melwood and the benefits of an HMO (Def.Ex. 6), and in March 1999, he told Porter that Melwood's termination was a result of FCE's poor service. (Def.Ex. 7.) Significantly, on Porter's March 26 letter, Herron wrote a note to Fellers asking her to "make a listing of the specific, really bad incidents [with FCE] we have had." (*Id.*)

17. Since Herron was presumably available to both sides, plaintiff cannot argue that Herron would have been a favorable witness, especially in the face of contrary documentary evidence relating to his displeasure with FCE. While it may well have been a "tough decision" for Herron, whom Beckman describes as "a gracious man and a very honorable person" (Beckman Test. at 45:24–46:8), there is no reason to presume it was a close call. Rather, as this Court has found, Melwood's decision to change plans was instigated by Fellers, and it was motivated by her preference for an HMO plan and her dissatisfaction with FCE.

### III. Remedies

18. Because plaintiff has suffered no loss as a result of the breach, it is entitled to only nominal damages. *Patel v. Howard Univ.*, 896 F.Supp. 199, 205 (D.D.C.1995) (citing *Garcia v. Llerena*, 599 A.2d 1138, 1142 (D.C.1991) (where plaintiff proves a breach of a contractual duty but the proof of damages is vague or speculative, he is entitled only to nominal damages); *Cahn v. Antioch Univ.*, 482 A.2d 120, 130 (D.C.1984) (same); Restatement (Second) of Contracts § 346(2)). The Court will award plaintiff one dollar, which is the appropriate amount for nominal damages. *Patel*, 896 F.Supp. at 205; *Wisconsin Ave. Assocs., Inc. v. 2720 Wisconsin Ave. Co-op. Ass'n, Inc.*, 441 A.2d 956, 961 (D.C.1982).

19. Plaintiff is not, however, entitled to an injunction. A permanent injunction should be issued where plaintiff demonstrates: 1) a strong likelihood of success on the merits; 2) that without injunctive relief they will suffer irreparable harm; 3) that, balancing the hardships, the issuance of an injunction will not substantially harm other interested parties; and 4) that the public interest favors the injunction. *Al–Fayed v. CIA*, 254 F.3d 300, 303 (D.C.Cir. 2001); *see National Ass'n of Psychiatric*

*Health Systems v. Shalala*, 120 F.Supp.2d 33, 44 (D.D.C.2000) (applying standard for preliminary injunction to request for permanent injunction); *National Mining Ass'n v. Army Corps of Engineers*, 145 F.3d 1399, 1409–10 (D.C.Cir.1998) (same). Plaintiff argues, without citation, that "[i]mmunizing a future breach would be irreparable injury." (Pl. Reply at 22.) This argument is unpersuasive. The Court has ruled that PSA breached the contract in 1998, but that this breach caused no damages. Although the parties have continued to do business to the present, plaintiff has offered no evidence that a future breach of the contract by defendant is imminent or even likely. Also, PSA has been reminded of the contract and made fully aware of its terms and its meaning, so future problems should be avoided. There is thus no irreparable injury to plaintiff in the absence of injunctive relief.

20. Alternatively, FCE argues that it is entitled to permanent injunctive relief because that remedy does not require proof of irreparable injury. (Pl. Findings of Fact at 25 (citing *Ifill v. District of Columbia*, 665 A.2d 185, 187–88) (D.C.1995).) In *Ifill*, the court noted that a "permanent injunction [ ] requires the trial court to find that there is no adequate remedy at law, the balance of equities favors the moving party, and success on the merits has been demonstrated." *Id.* at 188 (internal quotations omitted). Even under this standard, however, plaintiff's request for a permanent injunction is denied. The adequate remedy for the breach of contract at issue is nominal damages, and the use of a permanent injunction as a remedy for an action about a prior breach makes no sense.[16] *See Walsh v. Ford Motor Co.*, 130 F.R.D. 260, 266 (D.D.C.1990); *Clemons v. Board of Educ.*, 228 F.2d 853, 857 (6th Cir.1956) (reaffirming the traditional principle that "[e]quity will not interfere to restrain the breach of a contract ... when the legal remedy of compensatory damages would be complete and adequate"); Restatement (Second) of Contracts § 359(1) ("[A]n injunction will not be ordered if damages would be adequate to protect the expectation interest of the injured party.")

### IV. Attorneys' Fees and Costs

21. Plaintiff contends that it is entitled to attorneys' fees and costs under ¶ 14 of the Agreement, which provides, "[i]f any action at law or equity is necessary to enforce or interpret the terms of this Agreement, the prevailing party shall be entitled to reasonable attorneys' fees, costs, and necessary disbursements in addition to any other relief to which he or she may be entitled." (Pl.Ex. 1, ¶ 14.)

22. Under District of Columbia law, "[i]t is generally understood that the degree of success in litigation is a relevant factor in the award of attorney's fees. Statutes awarding attorney's fees normally limit such a right to the 'successful' or 'prevailing' party. The same general concept seems to be applied ordinarily in the interpretation of contractual provisions for

---

**16.** Similarly, plaintiff has offered no reason why the Court should grant its request for a declaratory judgment, which is an unnecessary remedy for a breach of contract. *See Pakideh v. Ahadi*, 99 F.Supp.2d 805, 808–09 (E.D.Mich.2000) (declaratory judgment request duplicative of simple breach of contract action for damages); *The Pantry, Inc. v. Stop-N-Go Foods, Inc.*, 777 F.Supp. 713, 717–18 (S.D.Ind.1991) (holding that "declaratory judgment claim [was] inappropriately raised because the plaintiff may be fully compensated if it prevails on the breach of contract claim"); *Newton v. State Farm Fire and Casualty Co.*, 138 F.R.D. 76, 79 (E.D.Va.1991) (no declaratory judgment available for breach of contract, because equitable remedy "serves no useful purpose and will not clarify the legal rights or obligations in question"). That request will therefore also be denied.

attorney's fees." *Fleming v. Carroll Publishing Co.*, 581 A.2d 1219, 1228 (D.C. 1990).

23. The Supreme Court has articulated a two-step process for determining the attorneys' fees to be awarded to a "prevailing party" under 42 U.S.C. § 1988, which—similar to ¶ 14 of the Agreement—provides that "the court, in its discretion, may allow the prevailing party . . . a reasonable attorney's fee as part of the costs." [17] In *Farrar v. Hobby*, 506 U.S. 103, 113 S.Ct. 566, 121 L.Ed.2d 494 (1992), the Supreme Court noted that the first step was to determine whether, in fact, there was a "prevailing party." The Court held that "a plaintiff who wins nominal damages is a prevailing party under § 1988. . . . Now that we are confronted with the question whether a nominal damages award is the sort of 'technical,' 'insignificant' victory that cannot confer prevailing party status, we hold that the prevailing party inquiry does not turn on the magnitude of the relief obtained." *Id.* at 112–14, 113 S.Ct. 566 (1992). Pursuant to *Farrar*, because FCE has been awarded nominal damages, it is the "prevailing party" under the terms of its contract with PSA.

24. A prevailing party is not, however, automatically entitled to full attorneys' fees. Rather, "the degree of the plaintiff's overall success goes to the reasonableness of a fee award." *Id.* at 114, 113 S.Ct. 566 (citing *Texas State Teachers Ass'n v. Garland Independent School District*, 489 U.S. 782, 793, 109 S.Ct. 1486, 103 L.Ed.2d 866 (1989)). This concept that an award of attorneys' fees should be proportional to the degree of overall success in the lawsuit applies not only in civil rights litigation, but also to contract disputes. *Fleming*,

581 A.2d at 1228. It is with regard to this "reasonableness" prong that the award of nominal damages is significant. "Although the 'technical' nature of a nominal damages award or any other judgment does not affect the prevailing party inquiry, it does bear on the propriety of fees awarded . . . . When a plaintiff recovers only nominal damages because of his failure to prove an essential element of his claim for monetary relief, the only reasonable fee is usually no fee at all." *Farrar*, 506 U.S. at 114–15, 113 S.Ct. 566. Here, plaintiff has failed to prove that the breach caused damages, which is an essential element of its claim. Plaintiff sought $1,686,624 in damages for the breach of the contract (Joint Pretrial Statement at 22), but was awarded only one dollar. Plaintiff was also unsuccessful in its requests for injunctive and declaratory relief. "[W]hile there is no *per se* rule that a plaintiff receiving nominal damages can never get a fee award, *Farrar* indicates that the award of fees in such a case will be rare." *Pino v. Locascio*, 101 F.3d 235, 238 (2d Cir.1996). Given the limited and technical nature of plaintiff's success, this is not that rare case. Under *Farrar*, therefore, the only reasonable fee is no fee. *See Norwood v. Bain*, 215 F.3d 1320 (4th Cir.2000) (attorneys' fees and damage awards should be proportional); *Fusion, Inc. v. Nebraska Aluminum Castings, Inc.*, 962 F.Supp. 1392, 1398 (D.Kan.1997) (same).

25. A plaintiff who is awarded nominal damages for a breach of contract is, however, ordinarily entitled to costs. *See, e.g., Lipscher v. LRP Publications, Inc.*, 266 F.3d 1305, 1321 (11th Cir.2001) ("Cases from this and other circuits consistently support shifting costs if the prevailing party obtains judgment on even a fraction of

---

**17.** The meaning of the term "prevailing party" is the same under § 1988 and Fed. R.Civ.P. 54(d), *Tunison v. Continental Airlines Corp.*, 162 F.3d 1187, 1189 (D.C.Cir.1998), and the parties here also accept that the term "prevailing party" in the Agreement should be construed in the same manner.

the claims advanced.") (citing *Head v. Medford,* 62 F.3d 351, 354 (11th Cir.1995)); Restatement (Second) of Contracts § 346, comment b. The Court will therefore award costs to plaintiff.

## CONCLUSION

For the reasons set forth above, the Court finds that defendant breached its contract with FCE, but that the breach caused no damages. Plaintiff shall be awarded nominal damages in the amount of $1, as well as costs, but its request for an injunction, declaratory relief, and attorneys' fees is denied.

A separate Judgment accompanies this Opinion.

## *JUDGMENT*

This cause having been tried by the court, it is hereby

**ORDERED**, for the reasons set forth in the accompanying Memorandum Opinion, that judgment in the amount of $1 is entered for plaintiff; and it is

**FURTHER ORDERED** that plaintiff shall be awarded costs; and it is

**FURTHER ORDERED** that plaintiff's request for a permanent injunction, declaratory relief, and attorneys' fees is **DENIED**.

This is a final appealable order.

**SO ORDERED.**